# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) PRODUCTS LIABILITY LITIGATION | MDL NO. 3094<br><br>THIS DOCUMENT RELATES TO ALL CASES<br><br>JUDGE KAREN SPENCER MARSTON |
| MELINDA MARKERT,<br>        *Plaintiff,*<br><br>v.<br><br>NOVO NORDISK A/S, NOVO NORDISK INC., and ELI LILLY AND COMPANY,<br>        *Defendants.* | COMPLAINT AND JURY DEMAND<br><br>CIVIL ACTION NO.: 2:25-cv-3992 |

## COMPLAINT AND DEMAND FOR JURY TRIAL

-------------------------------------------------------------------------------------------------------------------

Plaintiff files this Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections and privileges, and obligations of that Direct Filing Order and other Orders of the Court. Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court for the Northern District of Illinois as Plaintiff's designated venue ("Original Venue"). Plaintiff makes this selection based upon one (or more) of the following factors (check the appropriate box(es)):

X Plaintiff currently resides in Oak Park, IL (City/State).

X Plaintiff purchased and used Defendant(s)' products in Oak Park, IL (City/State).

__ The Original Venue is a judicial district in which Defendant _____ resides, and all Defendants are residents of the State in which the district is located (28 USC § 1391(b)(1)).

X The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically (28 USC § 1391(b)(2)): Northern District of Illinois.

__ There is no district in which an action may otherwise be brought under 28 USC § 1391, and the Original Venue is a judicial district in which Defendant _____ is subject to the Court's personal jurisdiction with respect to this action (28 USC § 1391(b)(3)).

__ Other reason (please explain): _____.

## NATURE OF THE CASE

1.      This is an action for damages suffered by Plaintiff, Melinda Markert, who was severely injured as a result of Plaintiff's use of Mounjaro, a prescription medication used to control blood sugar in adults with type 2 diabetes; Ozempic, an injectable prescription medication that is used to control blood sugar and to reduce cardiovascular risk in adults with type 2 diabetes.

2.      Ozempic and Mounjaro belong to a class of drugs called GLP-1 receptor agonists ("GLP-1RAs"). The active ingredient in Ozempic is known as semaglutide. The active ingredient in Mounjaro is known as tirzepatide. Other drugs and active ingredients detailed below also fall within the GLP-1 RA class, based on similarities in their mechanisms of action, physiologic effects, and chemical structure.

3.      Medications within the GLP-1RA class of drugs mimic the activities of physiologic GLP-1, a gut hormone that binds to receptors throughout the body and, notably, activates GLP-1 receptors in the pancreas to stimulate the release of insulin and suppress glucagon.[1]

4.      GLP-1 RAs are designed to work similarly, to stimulate insulin production and reduce glucose production, but engineered to last longer than naturally-occurring GLP-1, which has a short life and is quickly metabolized by enzymes.

5.      GLP-1 RAs are prescribed, for certain patient populations, to control blood sugar in adults with type 2 diabetes, reduce cardiac risk, and/or aid in chronic weight management.

6.      Defendants acknowledge that gastrointestinal events are well known side effects of the GLP-1RA class of drugs.[2] However, Defendants have downplayed the nature, duration, extent,

---

[1] D. Hinnen, *Glucagon-Like Peptide 1 Receptor Agonists for Type 2 Diabetes*, 30(3) DIABETES SPECTR. 202-10 (Aug. 2017), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5556578/.

[2] *See, e.g.*, C.T. Jones, *Ozempic Users Report Stomach Paralysis from Weight Loss Drug: 'So Much Hell'*, ROLLING STONE (Jul. 25, 2023), available at https://www.rollingstone.com/culture/culture-news/ozempic-stomach-paralysis-weight-loss-side-effects-1234794601.

and seriousness of gastrointestinal events and failed to warn about other adverse events caused by their GLP-1RAs. Defendants have never provided adequate warnings about the risks of, among other things, gastroparesis, all other injuries mentioned in this Complaint, and their sequelae.

7.     The decision to target the American population for the sale of Defendants' GLP-1RAs was not accidental. Defendants understood the vast financial potential of marketing medications for weight loss in the United States, where obesity rates were on the rise despite the culture's obsession with losing weight and being thin.

8.     Defendants set on a course to create and expand the market for weight-loss medication(s) by, among other things, advocating for obesity to be classified as a disease and thereby expanding the market for their drugs, spending hundreds of millions of dollars in an effort to change the medical consensus on how to treat obesity, implementing cutting-edge invasive, unprecedented and multifaceted marketing campaigns that were so effective they engrained these drugs in the pop culture zeitgeist, and spending untold millions in an effort to get weight-loss medications covered under public and private insurance. Defendants engaged in this conduct even before GLP-1 RAs were approved for weight loss, encouraging extensive off-label demand for, and use of, GLP-1 RAs.

9.     By undertaking that effort, Defendants also were systematically and intentionally targeting users of other diabetes medications. Defendants' promise of weight loss wrongfully enticed users of other diabetes medications to switch to a GLP-1 RA who never would have done so had it not been for the off-label promotion of those drugs.

10.     Defendants also sought to make the GLP-1 RAs more accessible by, among other things, marketing through telemedicine where the criteria for qualifying for the drugs, *e.g.*, Body Mass Index ("BMI"), are more easily manipulated.

11.     Defendants' efforts to conceal (or minimize) the risks associated with taking their drugs were intended to create the impression that these were "miracle drugs" to help users lose weight. However, Defendants never disclosed that many people who take these drugs stop taking them because of the drastic side effects (thereby never achieving weight loss or any health benefit allegedly associated with the drug); the drugs do not result in meaningful weight loss for up to 15% of people;[3] the average weight loss for someone taking the drugs is a modest 10.09% of the person's body weight;[4] and that a person will need to stay on these drugs for the rest of their lives to maintain the weight loss.[5] What is worse, Defendants kept this information hidden while actively degrading trust in the prevailing view that lifestyle changes like proper nutrition and exercise were the keys to health and can accomplish long-lasting weight loss and management for most people.

12.     The efforts to engrain GLP-1 RAs such as Ozempic in the public conscious, to manipulate the medical community's views on obesity treatment, and to make the drugs more accessible acted as a launching pad for the explosive growth of the GLP-1 RAs both for people with diabetes, and for people seeking to lose weight, whether they were using the drug as prescribed or off-label. Plaintiff would not have taken GLP-1 RAs if they had been provided a full and clear warning of the true risks of taking these drugs.

13.     Defendants' efforts to expand and grow the market both for treatment of diabetes and weight-loss, whether off-label or not, worked. The U.S. GLP-1 RA market is expected to exceed $100 Billion by 2030 with total U.S. users comprising about 9% of the population.[6] This

---

[3] Erica Carbajal, *Up to 15% of patients on weight loss drugs may be 'non-responders'*, BECKER'S HOSPITAL REV. (Apr. 1, 2024) available at https://www.beckershospitalreview.com/glp-1s/upto-15-of-patients-on-weight-loss-drugs-non-responders.html.

[4] Gao, et al., *Efficacy and safety of semaglutide on weight loss in obese or overweight patients without diabetes: A systematic review and meta-analysis of randomized controlled trials*, FRONTIERS IN PHARMACOLOGY 1 (2022).

[5] Wilding, et al., *Weight regain and cardiometabolic effects after withdrawal of semaglutide: The STEP 1 trial extension*, 24 DIABETES OBES METAB. 1553, 1562 ("[T]reatment withdrawal led to most of the weight loss being regained within 1 year, …, reinforcing the need for continued treatment to maintain weight loss ….").

[6] J.P. Morgan Research, *The increase in appetite for obesity drugs* (Nov. 29, 2023), available at

growth is a tremendous boon to Defendants but comes at a significant cost. Financially, it is expected that Defendants' lobbying efforts will pay off, and GLP-1 RAs may get added to prescription drug coverage under Medicare Part D in the coming years. Some analysts project that this will add $13.6 to $26.8 Billion to Medicare Part D expenses even if only 10% of people with obesity use them, causing a significant shift in premiums and coverage in other areas.[7]

14.      The outsized growth of the market for GLP-1 RAs also means that the patient base has expanded to include many patients who would be better served choosing alternate treatment paths. Defendants' marketing campaigns have altered the public understanding of weight loss treatment, creating the impression that GLP-1 RAs are not just one tool among many available to doctors, but are instead "miracle drugs." But, these patients, like Plaintiff, were lured into a false sense of hope that GLP-1 RAs would guarantee results and be efficacious and safe. Plaintiff injected themselves with GLP-1 RAs believing that they were doing something to promote their health when, in fact, it had the opposite effect.

15.      As a result of the foregoing, Plaintiff has suffered and was diagnosed with various forms of injury which were directly and proximately caused by their regular and prolonged use of GLP-1 RAs. Plaintiff's injuries include, but are not limited to gastroparesis and its sequelae, including debilitating nausea, debilitating vomiting, and emotional distress, among other injuries.

## **PARTY PLAINTIFF**

16.      Plaintiff, Melinda Markert, is a citizen of the United States, and is a resident of the State of Illinois.

17.      Plaintiff is 33 years old.

---

https://www.jpmorgan.com/insights/global-research/current-events/obesity-drugs#sectionheader#0.

[7] Vanderbilt University Medical Center, *Cost of covering antiobesity drugs could be billions to Medicare despite, a new analysis finds* (Mar. 15, 2023), available at https://www.vumc.org/health-policy/medicare-antiobesity-medications-nejm.

18.    Plaintiff used Ozempic from approximately June 2022 to August 2022.

19.    Plaintiff used Trulicity from approximately August 2022 to November 2022.

20.    Plaintiff's physician(s) ("prescribing physician(s)") prescribed the Ozempic and Mounjaro that Plaintiff used.

21.    As a result of using Ozempic and Mounjaro, Plaintiff was caused to suffer from gastroparesis and its sequelae and, as a result, sustained severe and debilitating personal injuries, pain, suffering, and emotional distress, and incurred medical expenses.

22.    As a result of using Ozempic and Mounjaro, Plaintiff was caused to suffer from gastroparesis and its sequelae, which resulted in, for example, debilitating nausea, and debilitating vomiting.

## **DEFENDANTS**

23.    Defendant Novo Nordisk Inc. is and at all relevant times has been a Delaware corporation with a principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey.

24.    Defendant Novo Nordisk A/S is and at all relevant times has been a public limited liability company organized under the laws of Denmark with a principal place of business in Bagsværd, Denmark.

25.    Defendants Novo Nordisk Inc. and Novo Nordisk A/S are referred to collectively herein as "the Novo Nordisk Defendants", "Novo Nordisk", or "Novo."

26.    Each of the Novo Nordisk Defendants was the agent and employee of Novo Nordisk and the other Defendants and, in doing the things alleged, was acting within the course and scope of such agency and employment and with Novo Nordisk and the other Defendants' actual and implied permission, consent, authorization and approval.

27.     In collaboration amongst themselves, as part of their business, and at all relevant times, the Novo Nordisk Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed GLP-1 RAs, including Ozempic. Alternatively, Novo has acquired the entity or entities who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed GLP-1 RAs, including Ozempic and is, thus, the successor to such entity or entities.

28.     Defendant Eli Lilly and Company is and at all relevant times has been an Indiana corporation with a principal place of business at 893 S. Delaware St., Indianapolis, Indiana.

29.     Eli Lilly designed, researched, manufactured, tested, labeled, advertised, promoted, marketed, sold, and/or distributed GLP-1 RAs, including Mounjaro.

30.     Novo Nordisk and Eli Lilly are collectively referred to herein as "Defendants".

## FACTUAL ALLEGATIONS

### A. Introduction to GLP-1 and GLP-1 RA Products

31.     Researchers first discovered GLP-1 in hamsters in 1983.[8] It is a hormone that helps regulate blood sugar, appetite, and digestion in animals, including humans; and is produced naturally in the brain and intestinal wall of humans.

32.     In 1993, researchers discovered that a peptide from the venom of gila monsters activated GLP-1 receptors.[9] Gila monsters can go for months without eating but maintain stable blood sugar levels because they make very high levels of a glucagon peptide called exendin-4. Thus, the gila monster served as the inspiration for the GLP-1 RA class of drugs.

---

[8] Bell, et al., *Hamster preproglucagon contains the sequence of glucagon and two related peptides*, 302 NATURE 716 (1983).
[9] Thorens, et al., *Cloning and functional expression of the human islet glp-1 receptor*, 42 DIABETES 1678 (1993).

33.     Following the discovery that exendin-4 is similar in structure to GLP-1, a synthetic version of exendin-4 was developed to treat diabetes. This became the first GLP-1 drug, known as Byetta, with the active ingredient exenatide, which came to market in 2005. Byetta was initially brought to market as a collaboration between Eli Lilly and Amylin.[10] Whereas naturally-occurring GLP-1 has a short half-life of just a few minutes, Byetta's half-life was noted to be 2.4 hours.[11]

34.     Simultaneously with the development of exenatide, Novo was developing another GLP-1 drug called liraglutide. In the early 1990s, Novo researchers discovered that when they injected liraglutide into rats, it caused them to stop eating almost entirely.[12] Liraglutide came to market in 2010, marketed initially as Victoza and later as Saxenda. Liraglutide has a half-life of 13-15 hours.[13]

35.     Various active ingredients fall within the GLP-1 RA class of drugs, including semaglutide (marketed by Novo as Ozempic, Wegovy, and Rybelsus), liraglutide (marketed by Novo as Saxenda, Victoza, and in combination with insulin as Xultophy 100/3.6), tirzepatide (marketed by Lilly as Mounjaro and Zepbound), dulaglutide (marketed by Lilly as Trulicity), exenatide (marketed by various companies as Byetta, Bydureon, and Bydureon BCise), albiglutide (marketed by GlaxoSmithKline as Tanzeum), and lixisenatide (marketed by Sanofi as Adlyxin and in combination with insulin as Soliqua 100/33). The U.S. Food & Drug Administration ("FDA") recognizes GLP-1 RAs as a class of drugs based on similarities in their mechanisms of action,

---

[10] News Release: Amylin and Lilly Announce FDA Approval of BYETTA(TM) (Exenatide Injection) (Apr. 29, 2005), *available at* https://investor.lilly.com/news-releases/news-releasedetails/amylin-and-lilly-announce-fda-approval-byettatm-exenatide (last visited Nov. 8, 2023) (describing the drug as a "collaboration" between Amylin and Lilly).

[11] Cai, et al., *Long-acting preparations of exenatide,* DRUG DES. DEVEL. THER. (Sept. 2013).

[12] Gina Kolata, *We Know Where New Weight Loss Drugs Came From, but Not Why They Work*, NEW YORK TIMES (Aug. 17, 2023), available at https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html.

[13] Rubino, et al., *Effect of Weekly Subcutaneous Semaglutide vs Daily Liraglutide on Body Weight in Adults with Overweight or Obesity without Diabetes: The STEP 8 Randomized Clinical Trial,* JAMA (Jan. 2022).

physiologic effects, and chemical structure.[14] Defendants likewise recognize that their GLP-1 RAs are members of the same class.[15]

36.     Medications within the GLP-1 RA class of drugs mimic the activities of physiologic GLP-1 in numerous ways,[16] including attaching to GLP-1 receptors, sending various signals in the body, triggering a sensation of satiety (or perception of fullness, thereby curbing users' appetites and decreasing intake of calories and nutrients),[17] acting on the pancreas to stimulate the release of insulin, suppressing the release of glucagon, and slowing or inhibiting gastric emptying and intestinal motility.[18]

37.     In contrast to naturally-occurring GLP-1, which has a short life and is quickly metabolized by enzymes, GLP-1 RAs are engineered to last longer, as previously noted. The chemical structure of GLP-1 RAs includes a fatty chain that inhibits such quick dissolution. GLP-1 RAs such as semaglutide have a long half-life of well over 100 hours, causing the drugs to stay in the body for a month or more after the last dose.

---

[14] *See* FDA Ozempic Summary Review, available at
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/209637Orig1s000SumR.pdf at 8 (including liraglutide, dulaglutide, and semaglutide in the GLP-1 RA class) (last visited Jan. 2, 2025); *see also* FDA Mounjaro Clinical Review, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2022/215866Orig1s000MedR.pdf at 52 (results of tirzepatide toxicology studies in animals were typical of the GLP-1 RA pharmacologic class) (last visited Jan. 2, 2025); *see also* https://www.fda.gov/industry/structuredproductlabeling-resources/pharmacologic-class (last visited Dec. 28, 2024).
[15] SURMOUNT-1 Clinical Trial Protocol at 45, available at
https://cdn.clinicaltrials.gov/largedocs/22/NCT04184622/Prot_000.pdf ("General safety characteristics of all studied doses of tirzepatide were similar to those of the GLP-1R agonist class…"); STEP-1 Clinical Trial Protocol at 15, accessible at https://cdn.clinicaltrials.gov/large-docs/35/NCT03548935/Prot_002.pdf ("[T]he tolerability and safety profile [of semaglutide] was overall consistent with… the GLP-1 RA class in general.").
[16] Cleveland Clinic, *GLP-1 Agonists* (Jul. 3, 2023), available at
https://my.clevelandclinic.org/health/treatments/13901-glp-1-agonists.
[17] *See* Bloemendaal, et al., *Effects of glucagon-like peptide 1 on appetite and body weight: focus on the CNS,* J. ENDOCRINOLOGY (Apr. 2014).
[18] Deane, et al., *Endogenous Glucagon-Like Peptide-1 Slows Gastric Emptying in Healthy Subjects, Attenuating Postprandial Glycemia*, 95(1) J. CLINICAL ENDO. METAB., 225-221 (January 1, 2010), available at https://academic.oup.com/jcem/article/95/1/215/2835243; American Society of Anesthesiologists, *Patients Taking Popular Medications for Diabetes and Weight Loss Should Stop Before Elective Surgery, ASA Suggests* (Jun. 29, 2023), available at https://www.asahq.org/about-asa/newsroom/news-releases/2023/06/patients-takingpopular-medications-for-diabetes-and-weight-loss-should-stop-before-elective-surgery.

38.    Most GLP-1 RAs are approved to treat type 2 diabetes,[19] but some (Wegovy, Saxenda, and Zepbound) are approved to treat obesity or to reduce cardiovascular risks.

39.    Most GLP-1 RAs are administered by injection, with the exception of Rybelsus, which is in tablet form.[20]

40.    Most of the GLP-1 RAs at issue in this case are weekly injectable drugs, except that liraglutide (the active ingredient in Saxenda and Victoza) is a daily injectable drug.[21]

41.    Most GLP-1 RAs are dosed between 0.25 and 2 milligrams per week, except that the maximum dose for Wegovy is 2.4 milligrams per week, and the maximum dose for Mounjaro is 15 milligrams per week.

42.    Because the risks associated with GLP-1 RAs are common to the entire class of drugs, any evidence regarding the association between NAION and its sequelae and *any* GLP-1 RA (such as tirzepatide, exenatide, liraglutide, albiglutide, dulaglutide, lixisenatide, and semaglutide) should have put Defendants on notice of the need to warn patients and prescribing physicians of the risk of gastroparesis and its sequelae associated with these drugs.

### 1.   FDA's Approval of Ozempic

43.    On December 5, 2016, Novo Nordisk announced submission of a new drug application (NDA) to the FDA for regulatory approval of once-weekly injectable semaglutide, a new glucagon-like peptide-1 (GLP-1) medication for treatment of type 2 diabetes. In the

---

[19] Unlike patients with type 1 diabetes, who cannot produce insulin, patients with type 2 diabetes cannot use insulin properly. *Compare* Cleveland Clinic, *Type 1 Diabetes* (Mar. 9, 2022), available at
https://my.clevelandclinic.org/health/diseases/21500-type-1-diabetes, *with* Cleveland Clinic, *Type 2 Diabetes* (Nov. 8, 2023), available at https://my.clevelandclinic.org/health/diseases/21501-type-2-diabetes.
[20] Cleveland Clinic, *GLP-1 Agonists* (Jul. 3, 2023), available at
https://my.clevelandclinic.org/health/treatments/13901-glp-1-agonists.
[21] *Id.*

announcement, Novo Nordisk represented that in clinical trials "once-weekly semaglutide had a safe and well tolerated profile with the most common adverse event being nausea."[22]

44.    On December 5, 2016, Defendant Novo Nordisk Inc. submitted NDA 209637, requesting that the FDA grant it approval to market and sell Ozempic (semaglutide) 0.5 mg or 1 mg injection in the United States as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus. On December 5, 2017, the FDA approved NDA 209637.[23]

45.    On March 20, 2019, Defendant Novo Nordisk Inc. submitted supplemental new drug application (sNDA) 209637/S-003 for Ozempic (semaglutide) 0.5 mg or 1 mg injection, requesting approval to expand its marketing of Ozempic by adding an indication to reduce the risk of major adverse cardiovascular events in adults with type 2 diabetes and established cardiovascular disease.[24] On January 16, 2020, the FDA approved sNDA 209637/S-003.[25]

46.    On May 28, 2021, Defendant Novo Nordisk Inc. submitted sNDA 209637/S-009, requesting approval for a higher 2 mg dose of Ozempic (semaglutide) injection. On March 28, 2022, the FDA approved sNDA 209637/S-009.[26]

---

[22] Novo Nordisk, *Novo Nordisk files for regulatory approval of once-weekly semaglutide in the US and EU for the treatment of type 2 diabetes* (Dec. 5, 2016), available at
https://ml.globenewswire.com/Resource/Download/d2f719e1-d69f-4918-ae7e-48fc6b731183 (visited on 9/26/23).
[23] FDA Approval Letter for NDA 209637 (Ozempic), available at
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/209637s000ltr.pdf (visited on 9/26/23).
[24] *Novo Nordisk files for US FDA approval of oral semaglutide for blood sugar control and cardiovascular risk reduction in adults with type 2 diabetes*, Cision PR Newswire (March 20, 2019), available at
https://www.prnewswire.com/news-releases/novo-nordisk-files-for-us-fda-approval-of-oral-semaglutide-for-blood-sugar-control-and-cardiovascular-risk-reduction-in-adults-with-type-2-diabetes-300815668.html (visited on 9/26/23).
[25] FDA Supplement Approval Letter for NDA 209637/A-003 (Ozempic), available at
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2020/209637Orig1s003ltr.pdf (visited on 9/26/23).
[26] FDA Supplement Approval Letter for NDA 209637/S-009 (Ozempic), available at
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/209637Orig1s009ltr.pdf (visited on 9/26/23).

## 2. FDA's Approval of Mounjaro

47.    On September 14, 2021, Eli Lilly submitted NDA 215866 Mounjaro (tirzepatide) injection as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus. On May 13, 2022, the FDA approved NDA 215866.[27]

48.    On May 13, 2022, Eli Lilly announced the FDA's approval of NDA 215866 Mounjaro (tirzepatide) injection as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes. In the press release, Eli Lilly disclosed a safety summary and provided a link to the Medication Guide and Prescribing Information, but gastroparesis was not identified as a risk.

## 3. Novo Nordisk's Marketing and Promotion of Ozempic

49.    On December 5, 2017, Novo Nordisk announced the FDA's approval of Ozempic (semaglutide) 0.5 mg or 1 mg injection in a press release stating that: "Novo Nordisk expects to launch OZEMPIC® in the U.S. in Q1 2018, with a goal of ensuring broad insurance coverage and patient access to the product. OZEMPIC® will be priced at parity to current market-leading weekly GLP-1RAs and will be offered with a savings card program to reduce co-pays for eligible commercially-insured patients. Additionally, as part of the access strategy, Novo Nordisk is working with appropriate health insurance providers to establish innovative contracting solutions."[28]

50.    On February 5, 2018, Novo Nordisk announced that it had started selling Ozempic in the United States and touted the medication as a "new treatment option[]" that "addresses the

---

[27] FDA Approval Letter for NDA 215866 (Mounjaro) available at
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/215866Orig1s000ltr.pdf (last visited on 8/24/23).
[28] *Novo Nordisk Receives FDA Approval of OZEMPIC® (semaglutide) Injection For the Treatment of Adults with Type 2 Diabetes*, Cision PR Newswire (December 05, 2017), available at
https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-of-ozempic-semaglutide-injection-for-the-treatment-of-adults-with-type-2-diabetes-300567052.html (visited on 9/26/23).

concerns and needs of people with diabetes[.]" Novo Nordisk offered an "Instant Savings Card to reduce co-pays to as low as $25 per prescription fill for up to two years."[29]

51.     Novo Nordisk promoted the safety and sale of Ozempic in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, and through other public outlets.

52.     On July 30, 2018, Novo Nordisk launched its first television ad for Ozempic, to the tune of the 1970s hit pop song "Magic" by Pilot, wherein Novo Nordisk advertised that "adults lost on average up to 12 pounds" when taking Ozempic, even though it is not indicated for weight loss.[30]

53.     On March 28, 2022, Novo Nordisk announced the FDA's approval of sNDA 209637/S-009 for a higher 2 mg dose of Ozempic (semaglutide) injection. In the press release, Novo Nordisk represented Ozempic as having "proven safety" and advertised that "plus it can help many patients lose some weight."[31]

54.     Since 2018, Novo Nordisk has spent more than $884,000,000 on television ads in the United States to promote its semaglutide drugs (Ozempic, Wegovy and Rybelsus) with the majority of the spending allocated specifically to advertising Ozempic.[32]

---

[29] *Novo Nordisk Launches Ozempic® and Fiasp®, Expanding Treatment Options for Adults with Diabetes*, Cision PR Newswire (February 05, 2018), available at https://www.prnewswire.com/news-releases/novo-nordisk-launches-ozempic-and-fiasp-expanding-treatment-options-for-adults-with-diabetes-300592808.html (visited on 9/26/23).

[30] *Ozempic TV Spot, 'Oh!'*, iSpot.tv (July 30, 2018), available at https://www.ispot.tv/ad/d6Xz/ozempic-oh (visited on 9/26/23).

[31] *Novo Nordisk receives FDA approval of higher-dose Ozempic® 2 mg providing increased glycemic control for adults with type 2 diabetes*, Cision PR Newswire (March 28, 2022), available at https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-of-higher-dose-ozempic-2-mg-providing-increased-glycemic-control-for-adults-with-type-2-diabetes-301512209.html (visited on 10/16/23).

[32] Ritzau, *Novo Nordisk runs TV ads in US for multimillion-dollar sum*, MedWatch (April 26, 2023), available at https://medwatch.com/News/Pharma___Biotech/article15680727.ece (visited on 9/26/23).

55.     In 2022, Novo Nordisk spent $180.2 million on Ozempic ads, including an estimated $157 million on national television ads for Ozempic, making Ozempic the sixth most advertised drug that year. As a result of its GLP-1RA treatments, including Ozempic, Novo Nordisk forecasts sales growth of 13% to 19% for 2023.[33]

56.     On July 6, 2023, it was reported that Novo Nordisk had spent $11 million in 2022 on food and travel for doctors "as part of its push to promote Ozempic and other weight loss-inducing diabetes drugs."[34] The spending bought more than 457,000 meals for almost 12,000 doctors while also flying doctors to places like London, Paris, Orlando, and Honolulu.[35]

57.     In an article published on July 21, 2023, the President and CEO of the Alliance of Community Health Plans described Novo Nordisk's spending on meals for doctors as "outrageous" and suggested that the millions Novo Nordisk spent marketing its drugs to prescribers would be better used furthering research about potential side effects and long-term effectiveness. The author cited research published in the spring of 2023 showing an increased risk of intestinal obstruction as a result of using GLP-1RA drugs.[36]

58.     As a result of Novo Nordisk's advertising and promotion efforts, Ozempic has been widely used throughout the United States. The number of prescriptions filled reached an all-time

---

[33] Adams B, Fierce Pharma, *The top 10 pharma drug ad spenders for 2022*, https://www.fiercepharma.com/special-reports/top-10-pharma-drug-brand-ad-spenders-2022 (visited on 9/26/23).

[34] Nicolas Florko, *Novo Nordisk bought prescribers over 450,000 meals and snacks to promote drugs like Ozempic*, National Center for Health Research (July 5, 2023), available at https://www.center4research.org/novo-nordisk-gave-doctors-450000-meals-ozempic/ (visited on 9/26/23).

[35] Nicolas Florko, *Novo Nordisk bought prescribers over 450,000 meals and snacks to promote drugs like Ozempic*, National Center for Health Research (July 5, 2023), available at https://www.center4research.org/novo-nordisk-gave-doctors-450000-meals-ozempic/ (visited on 9/26/23).

[36] Erin Prater, *Ozempic manufacturer Novo Nordisk spent $11 million last year 'wining and dining' doctors. Experts slam the move as a breach of doctor-patient trust,* Fortune Well (July 21, 2023), available at https://fortune.com/well/2023/07/21/ozempic-novo-nordisk-meals-travel-prescribing-doctors/ (visited on 9/26/23); *see also* Erin Prater, *Weight-loss drugs like Ozempic and Wegovy may put certain people at risk of serious complications, researchers warn*, Fortune Well (March 7, 2023), available at https://fortune.com/well/2023/03/07/ozempic-wegovy-elevated-risk-intestinal-obstruction-later-type-2-diabetes-weight-loss-drug/ (visited on 10/18/23).

high of 373,000 in one week in February of 2023, with more than half of those being new prescriptions.[37] In June 2023, it was reported that new prescriptions for Ozempic had surged by 140 percent from the prior year.[38]

59.    On TikTok, the hashtag #Ozempic had 273 million views as of November 22, 2022,[39] and currently has over 1.3 billion views.[40]

60.    On June 15, 2023, NBC News published a report about the "thousands of weight-loss ads on social media for the drugs Ozempic and Wegovy." While many of those ads were found to be from online pharmacies, medical spas, and diet clinics, as of June of 2023, Novo Nordisk was still running online social-media ads for its semaglutide products, despite claiming in May that it would stop running ads due to a shortage of the drug.[41]

61.    On July 10, 2023, a global media company declared Ozempic as "2023's buzziest drug" and one of the "Hottest Brands, disrupting U.S. culture and industry."[42]

62.    At all relevant times, Novo Nordisk was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and/or distribute Ozempic.

---

[37] Choi A, Vu H, *Ozempic prescriptions can be easy to get online. Its popularity for weight loss is hurting those who need it most*, CNN (March 17, 2023), available at https://www.cnn.com/2023/03/17/health/ozempic-shortage-tiktok-telehealth/ (visited on 9/26/23).

[38] Gilbert D, *Insurers clamping down on doctors who prescribe Ozempic for weight loss*, The Washington Post (June 12, 2023), available at https://www.washingtonpost.com/business/2023/06/11/weight-loss-ozempic-wegovy-insurance/ (visited on 9/26/23).

[39] Blum D, *What is Ozempic and Why Is It Getting So Much Attention?,* The New York Times (published Nov. 22, 2022, updated July 24, 2023), available at https://www.nytimes.com/2022/11/22/well/ozempic-diabetes-weight-loss.html (visited on 9/26/23).

[40] https://www.tiktok.com/tag/ozempic (visited on 11/14/23).

[41] Ingram D, *More than 4,000 ads for Ozempic-style drugs found running on Instagram and Facebook*, NBC News (June 15, 2023), available at https://www.nbcnews.com/tech/internet/ozempic-weight-loss-drug-ads-instagram-wegovy-semaglutide-rcna88602 (visited on 9/26/23).

[42] Bain P, *Ozempic was 2023's Buzziest Drug*, AdAge (July 10, 2023), available at https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571 (visited on 9/26/23).

### 4. Defendant's Marketing and Promotion of Mounjaro

63.     On May 13, 2022, Eli Lilly announced approval of Mounjaro, proclaiming "Mounjaro's safety … in a broad range of adults with type 2 diabetes."[43]

64.     At all relevant times, Eli Lilly was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and/or distribute Mounjaro.

65.     On October 6, 2022, Eli Lilly announced that the FDA had "granted Fast Track designation for the investigation of tirzepatide" to treat obese or overweight adults.[44]

66.     According to a recent publication, in fall 2022, analysts at UBS projected that Mounjaro could reach peak sales of $25 billion, asserting Eli Lilly's position in the multibillion-dollar obesity market.[45]

67.     In March 2023, it was reported that Eli Lilly kicked off a full-scale consumer campaign for Mounjaro after launching a digital campaign in January, including a 75-second TV spot supporting Mounjaro aired on FOX on February 12, the same day as Super Bowl LVII.[46]

68.     On April 11, 2023, the New York Times reported that Mounjaro was "gaining attention, with many people using it off-label to lose weight." The article described research which "found that Mounjaro may be even more powerful" than Ozempic, which it reported had recently "steamrollered through TikTok, talk shows and tabloids as people raved about using it off-label to

---

[43] *FDA approves Lilly's Mounjaro™ (tirzepatide) injection, the first and only GIP and GLP-1 receptor agonist for the treatment of adults with type 2 diabetes*, Cision PR Newswire (May 13, 2022) available at https://www.prnewswire.com/news-releases/fda-approves-lillys-mounjaro-tirzepatide-injection-the-first-and-only-gip-and-glp-1-receptor-agonist-for-the-treatment-of-adults-with-type-2-diabetes-301547339.html (last visited on 8/24/23).

[44] *Lilly Receives U.S. FDA Fast Track designation for tirzepatide for the treatment of adults with obesity, or overweight with weight-related comorbidities* (October 6, 2022) available at https://investor.lilly.com/news-releases/news-release-details/lilly-receives-us-fda-fast-track-designation-tirzepatide (last visited on 8/24/23).

[45] Munger L, BioSpace, *Eli Lilly and Novo Nordisk Face Off in Lucrative Obesity Market* (May 30, 2023) available at https://www.biospace.com/article/eli-lilly-and-novo-nordisk-face-off-in-lucrative-obesity-market/ (last visited on 8/24/23).

[46] O'Brien J, Medical Marketing and Media, *Eli Lilly kicks off consumer campaign for diabetes drug Mounjaro* (March 9, 2023) available at https://www.mmm-online.com/home/channel/campaigns/eli-lilly-kicks-off-consumer-campaign-for-diabetes-drug-mounjaro/ (last visited on 8/24/23).

lose weight." Although Eli Lilly denied promoting or encouraging "the off-label use of any of our medicines[,]" it was obvious to Eli Lilly and others in the industry that Mounjaro was following Ozempic's rising popularity for its weight loss effects. Furthermore, the same article also noted Eli Lilly's October announcement regarding the FDA's fast-track designation for its review of tirzepatide.[47]

## B. The Medical Literature and Clinical Trials Gave Defendants Notice of Gastroparesis, and Its Sequelae Being Causally Associated with GLP-1Ras

69.     As previously noted, Ozempic (semaglutide) belongs to a class of drugs called GLP-1 receptor agonists ("GLP-1RAs").

70.     Medications within the GLP-1RA class of drugs mimic the activities of physiologic GLP-1, which is a gut hormone that activates the GLP-1 receptor in the pancreas to stimulate the release of insulin and suppress glucagon.[48]

71.     Because the risk of gastroparesis is common to the entire class of drugs, any published literature regarding the association between gastroparesis and *any* GLP-1RA (such as tirzepatide, exenatide, liraglutide, albiglutide, dulaglutide, lixisenatide, and semaglutide) should have put Defendants on notice of the need to warn patients and prescribing physicians of the risk of gastroparesis associated with these drugs.

72.     In addition to pancreatic effects, the published medical literature shows that GLP-1 slows gastric emptying. As early as 2010, a study published in The Journal of Clinical Endocrinology & Metabolism indicated this effect.[49]

---

[47] Blum D, *The Diabetes Drug That Could Overshadow Ozempic,* The New York Times (published April 11, 2023, updated June 24, 2023) available at https://www.nytimes.com/2023/04/11/well/live/ozempic-mounjaro-weight-loss-diabetes.html (last visited on 8/24/23).
[48] Hinnen D, *Glucagon-Like Peptide 1 Receptor Agonists for Type 2 Diabetes*, 30(3) Diabetes Spectr., 202–210 (August 2017), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5556578/ (visited on 9/26/23).
[49] Deane AM et al., *Endogenous Glucagon-Like Peptide-1 Slows Gastric Emptying in Healthy Subjects, Attenuating Postprandial Glycemia*, 95(1) J Clinical Endo Metabolism, 225-221 (January 1, 2010), available at

73.     Defendants knew or should have known of this risk of gastroparesis from the clinical trials, medical literature, and case reports.

74.     A 2016 trial funded by Novo Nordisk measuring semaglutide and cardiovascular outcomes in patients with type 2 diabetes found more gastrointestinal disorders in the semaglutide group than in the placebo group, including a severe adverse event report of impaired gastric emptying with semaglutide 0.5 mg together with other serious gastrointestinal adverse events such as abdominal pain (upper and lower), intestinal obstruction, change of bowel habits, vomiting, and diarrhea.[50]

75.     Two subjects in a semaglutide trial pool by Novo Nordisk reported moderate adverse events of impaired gastric emptying and both subjects permanently discontinued treatment due to the adverse events. Three subjects also reported mild adverse events of impaired gastric emptying in the semaglutide run-in period of trial 4376. The cardiovascular outcomes trials included two cases of gastroparesis with the first subject being diagnosed with severe gastroparesis after one month in the trial and second subject being diagnosed with gastroparesis after approximately two months in the trial.

76.     A study published in 2017 evaluated the effect of GLP-1RAs on gastrointestinal tract motility and residue rates and explained that "GLP-1 suppresses gastric emptying by inhibiting peristalsis of the stomach while increasing tonic contraction of the pyloric region." The

---

https://academic.oup.com/jcem/article/95/1/215/2835243 (visited on 9/26/23); American Society of Anesthesiologists, *Patients Taking Popular Medications for Diabetes and Weight Loss Should Stop Before Elective Surgery, ASA Suggests* (June 29, 2023), available at https://www.asahq.org/about-asa/newsroom/news-releases/2023/06/patients-taking-popular-medications-for-diabetes-and-weight-loss-should-stop-before-elective-surgery (visited on 9/26/23).

[50] Marso, SP, et al., Semaglutide and Cardiovascular Outcomes in Patients with Type 2 Diabetes, N. Eng. J. Med. 375:1834-1844 (November 2016), available at https://www.nejm.org/doi/10.1056/NEJMoa1607141 (visited on 10/19/23).

study authors concluded that the GLP-1RA drug liraglutide "exhibited gastric-emptying delaying effects" and "the drug also inhibited duodenal and small bowel movements at the same time."[51]

77.    Another study in 2017 reviewed the survey results from 10,987 patients and 851 physicians and found that "GI-related issues were the top two patient-reported reasons for GLP-1RA discontinuation in the past 6 months, with 'Made me feel sick' as the most frequently reported reason (64.4%), followed by 'Made me throw up' (45.4%)."[52] As explained above, these are symptoms of gastroparesis.

78.    A 2019 study of the GLP-1RA drug dulaglutide identified adverse events for impaired gastric emptying and diabetic gastroparesis.

79.    In August of 2020, medical literature advised that some "patients do not know they have diabetic gastroparesis until they are put on a glucagon-like peptide 1 (GLP-1) receptor agonist such as ... semaglutide ... to manage their blood glucose." The article went on to explain that "[t]his class of drugs can exacerbate the symptoms of diabetic gastroparesis. ... Thus, GLP-1 receptor agonist therapy is not recommended for people who experience symptoms of gastroparesis."[53]

80.    In a September 2020 article funded and reviewed by Novo Nordisk, scientists affiliated with Novo Nordisk reported on two global clinical trials that evaluated the effect of semaglutide in patients with cardiovascular events and diabetes. More patients permanently discontinued taking oral semaglutide (11.6%) than placebo (6.5%) due to adverse events. The most common adverse events associated with semaglutide were nausea (2.9% with semaglutide versus

---

[51] Nakatani Y et al., *Effect of GLP-1 receptor agonist on gastrointestinal tract motility and residue rates as evaluated by capsule endoscopy*, 43(5) Diabetes & Metabolism, 430-37 (October 2017), available at https://www.sciencedirect.com/science/article/pii/S1262363617301076 (visited on 9/26/23).
[52] Sikirica M et al., *Reasons for discontinuation of GLP1 receptor agonists: data from a real-world cross-sectional survey of physicians and their patients with type 2 diabetes*, 10 Diabetes Metab. Syndr. Obes., 403-412 (September 2017), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5630073/
[53] Young CF, Moussa M, Shubrook JH, *Diabetic Gastroparesis: A Review*, Diabetes Spectr. (2020), Aug; 33(3): 290–297, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7428659/ (visited on 9/26/23).

0.5% with placebo), vomiting (1.5% with semaglutide versus 0.3% with placebo), and diarrhea (1.4% with semaglutide versus 0.4% with placebo). Injectable semaglutide had a discontinuation rate of 11.5-14.5% (versus 5.7-7.6% with placebo) over a two-year period. The authors acknowledged the potential for severe gastrointestinal events, warning that "[f]or patients reporting severe adverse gastrointestinal reactions, it is advised to monitor renal function when initiating or escalating doses of oral semaglutide." For patients with other comorbidities, the study warned that "patients should be made aware of the occurrence of gastrointestinal adverse events with GLP-1RAs." The study further identified as one "key clinical take-home point" that "patients should be made aware of the occurrence of gastrointestinal adverse events with GLP-1RAs."[54]

81.    A July 2021 article funded and reviewed by Novo Nordisk considered 23 randomized control trials conducted across the United States, Japan, and China and concluded that "gastrointestinal disturbances" were "well-known" side effects associated with semaglutide use. When compared with placebos, the subcutaneous (injection) form of the drug induced nausea in up to 20% of patients (versus up to 8% on the placebo group), vomiting in up to 11.5% of patients (versus up to 3% in the placebo group) and diarrhea in up to 11.3% of patients (versus up to 6% in the placebo group). Overall, the percentage of patients experiencing adverse events that led to trial product discontinuation was greatest for gastrointestinal related adverse events, with some trials experiencing 100% discontinuation due to gastrointestinal related adverse events. The mean value of gastrointestinal related adverse events that led to discontinuation averaged 57.75%. The study

---

[54] Mosenzon O, Miller EM, & Warren ML, *Oral semaglutide in patients with type 2 diabetes and cardiovascular disease, renal impairment, or other comorbidities, and in older patients*, Postgraduate Medicine (2020), 132:sup2, 37-47, available at https://doi.org/10.1080/00325481.2020.1800286 (visited on 9/26/23).

acknowledges that while nausea and vomiting are unwanted side effects, "they may be partly responsible for aspects of the drug's efficacy[.]"[55]

82.    An October 2021 article in the Journal of Investigative Medicine ("JIM") concluded that because gastroparesis can be associated with several medications, "[i]t is crucial to identify the causative drugs as discontinuation of the drug can result in resolution of the symptoms[.]" In diabetics, making this determination can be particularly "tricky" because both diabetes and GLP-1RAs can cause delayed gastric emptying. As such, "the timeline of drug initiation and symptom onset becomes of the upmost importance." The authors reviewed two case reports (discussed below) and concluded that history taking and making an accurate diagnosis of diabetic gastroparesis versus medication-induced gastroparesis is critical.[56]

83.    Case Report #1 in JIM involved a 52-year-old female with long-standing (10 years) well-controlled, type 2 diabetes who had been taking weekly semaglutide injections approximately one month prior to the onset of gastroparesis symptoms. The patient was referred with a 7-month history of post-prandial epigastric pain, accompanied by fullness, bloating, and nausea. A gastric emptying study showed a 24% retention of isotope in the patient's stomach at four hours, indicative of delayed gastric emptying. The patient discontinued semaglutide and her symptoms resolved after six weeks. The case report authors concluded that "thorough history taking revealed the cause [of gastroparesis] to be medication induced."[57]

---

[55] Smits MM & Van Raalte DH (2021), *Safety of Semaglutide*, Front. Endocrinol., 07 July 2021, doi: 10.3389/fendo.2021.645563, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8294388/ (visited on 9/26/23).

[56] Kalas MA, Galura GM, McCallum RW, *Medication-Induced Gastroparesis: A Case Report*, J Investig Med High Impact Case Rep. 2021 Jan-Dec; 9: 23247096211051919, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8529310/ (visited on 9/26/23).
[57] Kalas MA, Galura GM, McCallum RW, *Medication-Induced Gastroparesis: A Case Report*, J Investig Med High Impact Case Rep. 2021 Jan-Dec; 9: 23247096211051919, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8529310/ (visited on 9/26/23).

84.     Case Report #2 in JIM involved a 57-year-old female with a long-standing (16 years) type 2 diabetes who had been taking weekly dulaglutide injections (another GLP-1RA) for 15 months and suffering from abdominal bloating, nausea, and vomiting for 12 of those months. A gastric emptying study showed 35% retention of isotope in the patient's stomach at four hours, indicating delayed gastric emptying. After discontinuing dulaglutide, the patient experienced a gradual resolution of symptoms over a four-week period.[58]

85.     A June 2022 study reported GLP-1RA Mounjaro (tirzepatide) adverse events of vomiting, nausea, and "severe or serious gastrointestinal events."[59]

86.     An October 2022 study analyzed 5,442 GLP-1RA adverse gastrointestinal events. 32% were serious, including 40 deaths, 53 life-threatening conditions, and 772 hospitalizations. The primary events were nausea and vomiting. There were also adverse events for impaired gastric emptying.[60]

87.     A January 2023 meta-analysis of GLP-1RA (Mounjaro) adverse events reported high rates of nausea and vomiting.[61]

88.     In February 2023, a longitudinal study of GLP-1RA (dulaglutide) reported adverse events for nausea and vomiting, and one adverse event of impaired gastric emptying.[62]

---

[58] Kalas MA, Galura GM, McCallum RW, *Medication-Induced Gastroparesis: A Case Report*, J Investig Med High Impact Case Rep. 2021 Jan-Dec; 9: 23247096211051919, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8529310/ (visited on 9/26/23).
[59] Jastreboff, *Tirzepatide Once Weekly for the Treatment of Obesity*, N Engl J Med, at 214 (June 4, 2022) (https://doi.org/10.1056/nejmoa2206038).
[60] Shu, *Gastrointestinal adverse events associated with semaglutide: A pharmacovigilance study based on FDA adverse event reporting system*, Front. Public Health (Oct. 20, 2022). (https://doi.org/10.3389%2Ffpubh.2022.996179).
[61] Mirsha, *Adverse Events Related to Tirzepatide*, J. of Endocrine Society (Jan. 26, 2023) (https://doi.org/10.1210%2Fjendso%2Fbvad016).
[62] Chin, *Safety and effectiveness of dulaglutide 0.75 mg in Japanese patients with type 2 diabetes in real-world clinical practice: 36 month postmarketing observational study*, J Diabetes Investig (Feb. 2023) (https://doi.org/10.1111%2Fjdi.13932).

89.     On March 28, 2023, a case study concluded that impaired gastric emptying is "a significant safety concern, especially since it is consistent with the known mechanism of action of the drug."[63]

90.     On June 29, 2023, the American Society of Anesthesiologists ("ASA") warned that patients taking semaglutide and other GLP-1RAs should stop the medication at least a week before elective surgery because these medications "delay gastric (stomach) emptying" and "the delay in stomach emptying could be associated with an increased risk of regurgitation and aspiration of food into the airways and lungs during general anesthesia and deep sedation." The ASA also warned that the risk is higher where patients on these medications have experienced nausea and vomiting.[64]

91.     News sources have identified the potential for serious side effects in users of Ozempic, including gastroparesis, leading to hospitalization.[65] For example, NBC News reported in January 2023 that some Ozempic users were discontinuing use because their symptoms were unbearable, and one user said that five weeks into taking the medication she found herself unable to move off the bathroom floor because she had "vomited so much that [she] didn't have the energy

---

[63] Klein, Semaglutide, delayed gastric emptying, and intraoperative pulmonary aspiration: a case report, Can J. Anesth (Mar. 28, 2023) (https://doi.org/10.1007/s12630-023-02440-3).

[64] American Society of Anesthesiologists, *Patients Taking Popular Medications for Diabetes and Weight Loss Should Stop Before Elective Surgery, ASA Suggests* (June 29, 2023), available at https://www.asahq.org/about-asa/newsroom/news-releases/2023/06/patients-taking-popular-medications-for-diabetes-and-weight-loss-should-stop-before-elective-surgery (visited on 9/26/23).

[65] Penny Min, *Ozempic May Cause Potential Hospitalizations*, healthnews (June 26, 2023), available at https://healthnews.com/news/ozempic-may-cause-potential-hospitalizations/ (visited on 9/26/23); Elizabeth Laura Nelson, *These Are the 5 Most Common Ozempic Side Effects, According to Doctors*, Best Life (April 3, 2023), available at https://bestlifeonline.com/ozempic-side-effects-news/ (visited on 9/26/23); Cara Shultz, *Ozempic and Wegovy May Cause Stomach Paralysis in Some Patients*, People (July 26, 2023), available at https://people.com/ozempic-wegovy-weight-loss-stomach-paralysis-7565833 (visited on 9/26/23); CBS News Philadelphia, *Popular weight loss drugs Ozempic and Wegovy may cause stomach paralysis, doctors warn* (July 23, 2023), available at https://www.cbsnews.com/philadelphia/news/weight-loss-drugs-wegovy-ozempic-stomach-paralysis/ (visited on 9/26/23).

to get up."[66] CNN reported in July that one Ozempic user diagnosed with gastroparesis vomits so frequently that she had to take a leave of absence from her teaching job.[67]

92.    A July 25, 2023, article in Rolling Stone magazine—"*Ozempic Users Report Stomach Paralysis from Weight Loss Drug: 'So Much Hell'*"—highlighted three patients who have suffered severe gastrointestinal related events, including gastroparesis, as a result of their use of GLP-1RAs. Patient 1 (female, age 37) reported incidents of vomiting multiple times per day and being unable to eat. The patient's physician diagnosed her with severe gastroparesis and concluded that her problems were caused and/or exacerbated by her use of a GLP-1RA medication. Patient 2 (female) used Ozempic for one year and reported incidents of vomiting, including multiple times per day. The patient's physician diagnosed her with severe gastroparesis related to her Ozempic use. Patient 3 (female, age 42) experienced severe nausea both during and after she discontinued use of a GLP-1RA. In a statement to Rolling Stone, Novo Nordisk acknowledged that "[t]he most common adverse reactions, as with all GLP-1 RAs, are gastrointestinal related." Novo Nordisk further stated that while "GLP-1 RAs are known to cause a delay in gastric emptying, … [s]ymptoms of delayed gastric emptying, nausea and vomiting are listed as side effects." Novo Nordisk did not claim to have warned consumers about gastroparesis or other severe gastrointestinal issues.[68]

93.    On July 25, 2023, CNN Health reported that patients taking Ozempic have been diagnosed "with severe gastroparesis, or stomach paralysis, which their doctors think may have

---

[66] Bendix A, Lovelace B Jr., *What it's like to take the blockbuster drugs Ozempic and Wegovy, from severe side effects to losing 50 pounds*, NBC News (Jan. 29, 2023), available at https://www.nbcnews.com/health/health-news/ozempic-wegovy-diabetes-weight-loss-side-effects-rcna66493 (visited on 9/26/23).

[67] Brenda Goodman, *They took blockbuster drugs for weight loss and diabetes. Now their stomachs are paralyzed*, CNN (July 25, 2023), available at https://www.cnn.com/2023/07/25/health/weight-loss-diabetes-drugs-gastroparesis/index.html (visited on 9/26/23).

[68] CT Jones, *Ozempic Users Report Stomach Paralysis from Weight Loss Drug: 'So Much Hell'*, Rolling Stone (July 25, 2023), available at https://www.rollingstone.com/culture/culture-news/ozempic-stomach-paralysis-weight-loss-side-effects-1234794601 (visited on 9/26/23).

resulted from or been exacerbated by the medication they were taking, Ozempic." Another patient taking Wegovy (semaglutide) suffered ongoing nausea and vomiting, which was not diagnosed, but which needed to be managed with Zofran and prescription probiotics.[69]

94.    On July 26, 2023, a New York hospital published an article to its online health blog section "What You Need to Know About Gastroparesis" entitled "Delayed Stomach Emptying Can Be Result of Diabetes or New Weight-Loss Medicines." It was reported that a growing number of gastroparesis cases had been seen in people taking GLP-1RAs. The article noted that the weight-loss drugs can delay or decrease the contraction of muscles that mix and propel contents in the gastrointestinal tract leading to delayed gastric emptying. One concern raised was that patients and doctors often assume the symptoms of gastroparesis are reflux or other gastrointestinal conditions, meaning it may take a long time for someone to be diagnosed correctly.[70]

95.    In an October 5, 2023, Research Letter published in the Journal of the American Medical Association ("JAMA"), the authors examined gastrointestinal adverse events associated with GLP-1RAs used for weight loss in clinical setting and reported that use of GLP-1RAs compared with use of bupropion-naltrexone was associated with increased risk of pancreatitis, gastroparesis, and bowel obstruction.[71] The study found that patients prescribed GLP-1RAs were at 4.22 times higher risk of intestinal obstruction and at 3.67 times higher risk of gastroparesis.

---

[69] Brenca Goodman, *They took blockbuster drugs for weight loss and diabetes. Now their stomachs are paralyzed,* CNN Health (July 25, 2023), available at https://www.cnn.com/2023/07/25/health/weight-loss-diabetes-drugs-gastroparesis (last visited on 9/26/23).

[70] *Delayed Stomach Emptying Can Be Result of Diabetes or New Weight-Loss Medicines*, Montefiore Health Blog article (released July 26, 2023), available at https://www.montefiorenyack.org/health-blog/what-you-need-know-about-gastroparesis (last visited on 9/26/2023).

[71] Mohit Sodhi, et al., *Risk of Gastrointestinal Adverse Events Associated with Glucagon-Like Peptide-1 Receptor Agonists for Weight Loss*, JAMA (published online October 5, 2023), available at https://jamanetwork.com/journals/jama/fullarticle/2810542 (last visited 10/19/23).

96.     The medical literature listed above is not a comprehensive list, and several other case reports have indicated that GLP-1RAs can cause gastroparesis and impaired gastric emptying.[72]

97.     Defendants knew or should have known of the causal association between the use of GLP-1RAs and the risk of developing gastroparesis and its sequelae, but they ignored the causal association. Defendants' actual and constructive knowledge derived from their clinical studies, case reports, medical literature, including the medical literature and case reports referenced above in this Complaint.

98.     On information and belief, Defendants not only knew or should have known that their GLP-1RAs cause delayed gastric emptying, resulting in risks of gastroparesis, but they may have sought out the delayed gastric emptying effect due to its association with weight loss. For example, a recent study published in 2023 notes that "it has been previously proposed that long-acting GLP-1RAs could hypothetically contribute to reduced energy intake and weight loss by delaying GE [gastric emptying,]" and the study authors suggested "further exploration of peripheral mechanisms through which s.c. semaglutide, particularly at a dose of 2.4. mg/week, could potentially contribute to reduced food and energy intake."[73]

---

[72] Cure, *Exenatide and Rare Adverse Events*, N. Eng. J. Med. (May 1, 2008) (https://doi.org/10.1056/nejmc0707137); Rai, *Liraglutide-induced Acute Gastroparesis*, Cureus (Dec. 28, 2018) (https://doi.org/10.7759%2Fcureus.3791); Guo, *A Post Hoc Pooled Analysis of Two Randomized Trials*, Diabetes Ther (2020) (https://doi.org/10.1007%2Fs13300-020-00869-z); Almustanyir, *Gastroparesis With the Initiation of Liraglutide: A Case Report*, Cureus (Nov. 28, 2020) (https://doi.org/10.7759/cureus.11735); Ishihara, *Suspected Gastroparesis With Concurrent Gastroesophageal Reflux Disease Induced by Low-Dose Liraglutide*, Cureus (Jul. 16, 2022) (https://doi.org/10.7759/cureus.26916); Preda, *Gastroparesis with bezoar formation in patients treated with glucagon-like peptide-1 receptor agonists: potential relevance for bariatric and other gastric surgery*, BJS Open (Feb. 2023) (https://doi.org/10.1093%2Fbjsopen%2Fzrac169).

[73] Jensterle M et al., *Semaglutide delays 4-hour gastric emptying in women with polycystic ovary syndrome and obesity*, 25(4) Diabetes Obes. Metab. 975-984 (April 2023), available at https://dom-pubs.onlinelibrary.wiley.com/doi/epdf/10.1111/dom.14944 (visited on 9/26/23).

**C. Defendants Failed to Warn of the Risk of Gastroparesis and Its Sequelae**

99.    The Prescribing Information for Ozempic (the "label") discloses "Warnings and Precautions" and "Adverse Reactions" but does not adequately warn of the risk of gastroparesis, ileus, intestinal obstruction, and their sequelae.[74]

100.    The Ozempic label lists nausea, vomiting, diarrhea, abdominal pain, and constipation as common adverse reactions reported in Ozempic patients, but it does not include these adverse reactions in its "Warnings and Precautions" section, nor does it warn that these adverse reactions are symptoms of more severe conditions, including gastroparesis, ileus, intestinal obstruction, and their sequelae. In fact, gastroparesis and intestinal obstruction are not mentioned at all in the label.

101.    On September 22, 2023, Novo Nordisk changed the Ozempic label by adding "Gastrointestinal Disorders: Ileus" to the "Adverse Reactions" section of the label under a subheading of "Postmarketing Experience".[75] The label notes that ileus has "been reported during post-approval use of semaglutide, the active ingredient of OZEMPIC." Still, however, Novo Nordisk downplays the severity of the risk, does not warn that Ozempic can cause ileus, and does not include ileus as a risk in the "Warnings and Precautions" section of the label, even though Novo Nordisk had knowledge of the risk.

102.    Instead of properly disclosing gastrointestinal risks, the label discloses delayed gastric emptying in the "Drug Interaction" section and notes that Ozempic "may impact absorption of concomitantly administered oral medications." Similarly, in the "Mechanism of Action" section, the label minimizes gastrointestinal risks by stating that "[t]he mechanism of blood glucose

---

[74] https://www.novo-pi.com/ozempic.pdf
[75] https://www.accessdata.fda.gov/scripts/cder/safetylabelingchanges/index.cfm?event=searchdetail.page&DrugNameID=2183

lowering also involves a minor delay in gastric emptying in the early postprandial phase." These statements only describe the drug's mechanism of action and do not disclose gastroparesis, ileus, intestinal obstruction, and their sequelae as *risks* of taking Ozempic, nor do they disclose gastroparesis as a chronic condition that can result as a consequence of taking Ozempic.

103.    Similarly, Novo Nordisk's main promotional website for Ozempic (ozempic.com) includes a variety of information about the benefits of Ozempic relating to blood sugar, cardiovascular health, and weight loss, as well as "Important Safety Information" – however, Novo Nordisk does not disclose the risk of gastroparesis, ileus or intestinal obstruction within the "Important Safety Information" section of their promotional website.[76]

104.    None of Defendants' additional advertising or promotional materials warned prescription providers or the general public of the risks of gastroparesis, ileus, intestinal obstruction and their sequelae associated with GLP-1RAs.

105.    In January 2020, Novo Nordisk removed the "Instructions" portion from Section 17 "Patient Counseling Information" of the Ozempic label, which had instructed prescribers to "[a]dvise patients that the most common side effects of Ozempic are nausea, vomiting, diarrhea, abdominal pain and constipation." These instructions were present in the 2017 and 2019 labels.

106.    The 2017 and 2019 labels for Ozempic also instructed physicians that "vomiting … decreases over time in the majority of patients." As a result, a physician would not only fail to appreciate vomiting as a symptom of gastroparesis but, even worse, would encourage a patient to continue using Ozempic despite symptoms of gastroparesis.

107.    In its section on "Females and Males of Reproductive Potential," the Ozempic label advises female users to discontinue Ozempic at least 2 months before a planned pregnancy due to

---

[76] *See* Ozempic.com (visited on 10/16/23).

the long washout period for semaglutide. This demonstrates that Novo Nordisk knew or should have known that symptoms, such as continuous and violent vomiting, can linger long after the drugs are discontinued and shows the need to warn of gastroparesis, ileus, intestinal obstruction, and their sequelae.

108.    From the date Novo Nordisk received FDA approval to market Ozempic until the present time, Novo Nordisk made, distributed, marketed, and/or sold Ozempic without adequate warning to Plaintiff's prescribing physician(s) and/or Plaintiff that Ozempic was causally associated with and/or could cause gastroparesis, ileus, intestinal obstruction and their sequelae.

109.    The Prescribing Information for Mounjaro discloses "Warnings and Precautions" and "Adverse Reactions" but does not adequately warn of the risk of gastroparesis and its sequalae.[77]

110.    The Mounjaro label lists nausea, diarrhea, decreased appetite, vomiting, constipation, dyspepsia, and abdominal pain as common adverse reactions, but it does not indicate a severity of symptoms. Even though the label warns about the risk of Severe Gastrointestinal Disease, gastroparesis is not specifically mentioned.

111.    None of Defendants' additional advertising or promotional materials warned prescription providers or the general public of the risks of gastroparesis and its sequelae associated with GLP-1RAs.

112.    Upon information and belief, Defendants knew or should have known of the causal association between the use of GLP-1RAs and the risk of developing gastroparesis and its sequelae. Defendants' actual and constructive knowledge derived from their clinical studies, case

---

[77] Mounjaro prescribing information, available at
https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=d2d7da5d-ad07-4228-955f-cf7e355c8cc0 (last visited on 8/24/23).

reports, and the medical literature, including the medical literature and case reports referenced in this Complaint.

113.    Upon information and belief, Defendants ignored the causal association between the use of GLP-1RAs and the risk of developing gastroparesis and its sequelae.

114.    Novo Nordisk's failure to disclose information that they possessed regarding the causal association between the use of GLP-1RAs and the risk of developing gastroparesis and its sequelae, rendered the warnings for Ozempic inadequate.

115.    On information and belief, as a result of Novo Nordisk's inadequate warnings, the medical community at large, and Plaintiff's prescribing physician in particular, were not aware that Ozempic and Mounjaro can cause gastroparesis, nor were they aware that "common adverse reactions" listed on the label might be sequelae of gastroparesis, ileus, and intestinal obstruction.

116.    On information and belief, had Novo Nordisk adequately warned Plaintiff's prescribing physician that Ozempic and Mounjaro are causally associated with gastroparesis and its sequelae, then the physician's prescribing decision would have changed by not prescribing Ozempic and Mounjaro, or by monitoring Plaintiff's health for symptoms of gastroparesis, ileus, and intestinal obstruction, and discontinuing Ozempic and Mounjaro when the symptoms first started.

117.    By reason of the foregoing acts and omissions, Plaintiff was caused to suffer from gastroparesis and its sequelae, which resulted in severe personal injuries, physical pain, and mental anguish, including diminished enjoyment of life, and fear of developing any of the above-named health consequences.

1. **The Sponsor of a Drug is Responsible for Ensuring the Safety of Its Drug and for Warning**

118.    The Sponsor of a drug is responsible for the safety of its product.

119.    A drug company is responsible for alerting healthcare providers and patients of risks that are unknown or not well understood.

120.    The Institute of Medicine has stated that FDA's ability to oversee drug safety is limited, especially after approval of a drug.

121.    The Institute of Medicine wrote the following in a report entitled The Future of Drug Safety: Promoting and Protecting the Health of the Public: "The drug safety system is impaired by the following factors: serious resource constraints that weaken the quality and quantity of the science that is brought to bear on drug safety; an organizational culture in CDER (FDA Center for Drug Evaluation and Research) that is not optimally functional; and unclear and insufficient regulatory authorities particularly with respect to enforcement." The Report further stated that "FDA, contrary to its public health mission, and the pharmaceutical industry, contrary to its responsibility to the users of its products (and its shareholders), do not consistently demonstrate accountability and transparency to the public by communicating safety concerns in a timely and effective fashion."

122.    The FDA has insufficient resources to monitor the 11,000 drugs on the market.

123.    Manufacturers have access to information about their drugs, especially in the post-approval phase as new risks emerge, that is superior to the access that FDA has.

124.    Uncommon risks, or those that appear as common conditions, develop after long periods of time, or have adverse impacts on special populations, may go undetected in clinical trials.

125.    If a drug company has reason to know the risks of a drug may result in adverse events, even if it develops that knowledge in the post-approval context, that company has a responsibility to investigate those risks and to provide necessary information healthcare providers.

126.    The following FDA standards govern a manufacturer's duty to warn: 21 C.F.R. § 201.57(c)(6): Warnings and precautions: "This section must describe clinically significant adverse reactions … the labeling must be revised to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association of a serious hazard with a drug; a causal relationship need not have been definitely established …"

127.    In addition, under 21 C.F.R. § 201.57(c)(6), the Warning and Precaution Section of prescription drug labels must "describe clinically significant adverse reactions (including any that are potentially fatal, are serious even if infrequent, or can be prevented or mitigated through appropriate use of the drug), other potential safety hazards …"

128.    It is a central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times.

129.    A manufacturer is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market.

130.    According to industry guidance on warnings in labeling from the FDA in 2011, "The WARNINGS AND PRECAUTIONS section is intended to identify and describe a discrete set of adverse reactions and other potential safety hazards that are *serious* or are *otherwise clinically significant* because they have implications for prescribing decisions or for patient management."[78]

---

[78] U.S. Dept. of Health & Human Services, Food & Drug Admin., *Guidance for Industry: Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products – Content and Format* (Oct. 2011), at 5, available at https://www.fda.gov/files/drugs/published/Warnings-and-Precautions--Contraindications--and-Boxed-Warning-

131.    FDA's Guidance also states, "Adverse reactions that do not meet the definition of a serious adverse reaction, but are otherwise clinically significant because they have implications for prescribing decisions or patient management, should also be included in the WARNINGS AND PRECAUTIONS section."[79]

132.    The medical literature discussing gastroparesis describes the distressing nature of the condition and its potential to profoundly limits a person's quality of life.[80]

## 2.    Defendants' Marketing of GLP-1 RAs Was Intentionally Deceptive and Misleading and Lacked Fair Balance

133.    Defendants' extensive multifaceted advertising, marketing and promotion of GLP-1 RAs consistently highlighted and overstated the weight loss benefits of taking a GLP-1 RA while failing to disclose the risks identified with those drugs and concealing other information that would be material to Plaintiff and their physician in weighing the risks and benefits of taking a GLP-1 RA.

134.    Defendants did not disclose and/or minimize the risks of developing gastroparesis and its sequelae.

135.    In addition, Defendants intentionally omitted other facts that they knew to be true from their labels, physician communications, marketing, website, public statements, and other public facing communications. These documents omit facts that include: (1) the average person only loses a small percentage of their body weight while on a GLP-1 RA; (2) GLP-1 RAs are not effective for everyone; (3) patients gain the weight back when they stop taking the GLP-1 RA (*i.e.*,

---

Sections-of-Labeling-for-Human-Prescription-Drug-and-Biological-Products-%E2%80%94-Content-and-Format.pdf.

[79] *Id.* at 6.

[80] *See generally, e.g.*, Lee et al, *Health-Related Social Needs in Patients With Gastroparesis: Relationships to Symptom Severity and Quality of Life*, 6 GASTRO. HEP. ADV. 48 (2023); Simons & Kline, *Scoping review: the social and emotional impacts of gastroparesis*, TRANSL. GASTROENTEROL. HEPATOL. (2024).

patients have to stay on the drug forever); (4) the weight loss achieved while on a GLP-1 RA is not a healthy weight loss; (5) when a patient regains the weight loss achieved while on a GLP-1 RA, they are typically less healthy than when they began the medication; and (6) many people stop taking a GLP-1 RA relatively quickly because of trouble tolerating the drugs. These facts are critical to the balancing of risks and benefits facing most patients.

### a. Average Weight Loss is Modest

136.     Studies show that the real number are much lower. Measured across the first 12 weeks of the drug, when most people are on the drug, the numbers are closer to 3.6% to 5.9% of body weight.[81] On July 8, 2024, a JAMA Internal Medicine article suggested that both Novo and Lilly overstated the weight loss benefits of their drug in advertisements. Over a year's time, those on tirzepatide (Mounjaro/Zepbound) lost an average of 15.3% of their body weight compared to 8.3% for semaglutide (Ozempic/Wegovy) users. Only 18% of those on semaglutide reported a weight loss of at least 15% of their body weight after one year of treatment.[82] More importantly, Novo's claim that their drugs create lasting weight loss are also misleading: their own data shows that only 9.4% of patients on the highest dose available sustain weight loss over a four-year period.[83]

### b. Non-Responders

137.     Some research suggests that patients taking semaglutide (*i.e.*, Ozempic and Wegovy) "found about 14% of patients lost less than 5% of their body weight and one-third lost less than 10%" while a separate trial focused on tirzepatide (Mounjaro and Zepbound)

---

[81] *See* https://www.wegovy.com/aboutwegovy/why-wegovy.html for Novo Nordisk and https://zepbound.lilly.com/ for Lilly.
[82] Rodriguez et al., *Semaglutide vs Tirzepatide for Weight Loss in Adults With Overweight or Obesity*, 184(9) JAMA INTERN. MED. 1056–64 (2024), doi:10.1001/jamainternmed.2024.2525, available at https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2821080.
[83] Novo Nordisk, *Obesity care*, CMD24: Capital Markets Day (Mar. 7, 2024), available at https://www.novonordisk.com/content/dam/nncorp/global/en/investors/irmaterial/cmd/2024/P5-Obesity-Care.pdf.

"demonstrated similar results."[84] Notably, the article discussing the research states that "Wegovy and Zepbound have been approved by the FDA for weight loss, while Ozempic and Mounajro have been prescribed for that purpose in an off-label fashion."

### c. Patients Must Remain on the Drug to Sustain Weight Loss

138.    For those who lose weight, they typically need to stay on the drug forever to maintain the weight loss.[85] A Medscape article from March of 2024 explains that when "patients stop taking GLP-1s, they tend to regain most of that weight within a year, studies showed."[86]

139.    Novo has publicly recognized that most individuals will regain all the weight back within five years of stopping Ozempic or Wegovy.[87] A trial published by Novo showed that, after a year, participants had gained back two thirds of the weight lost after they stopped taking semaglutide.[88] Indeed, Novo has acknowledged that some individuals will regain even more weight after stopping Ozempic or Wegovy than they initially lost.[89]

140.    As noted by Novo's Martin Holst Lange: "once the majority of the weight loss is accrued, you don't go back and start to increase in weight *if you stay on the drug*."[90]

---

[84] Carbajal, Erica, *Up to 15% of patients on weight loss drugs may be 'non-responders*, BECKER'S HOSPITAL REV. (April 1, 2024) available at https://www.beckershospitalreview.com/glp-1s/upto-15-of-patients-on-weight-loss-drugs-non-responders.html.

[85] M. Karth, *Is Semaglutide a Miracle Weight-Loss Drug?*, PSYCHOLOGY TODAY (Apr. 1, 2023), available at https://www.psychologytoday.com/ie/blog/the-neuroscience-of-eating-disorders/202303/ozempic-and-wegovy-is-semaglutide-a-miracle-weight.

[86] Julie Stewart, *Help Patients Prevent Weight Gain After Stopping GLP-1s*, MEDSCAPE MED. NEWS (Mar. 18, 2024), available at https://www.medscape.com/viewarticle/help-patients-prevent-weightgain-after-stopping-glp-1s-2024a10004z9?form=fpf.

[87] A. Constantino, *People taking obesity drugs Ozempic and Wegovy gain weight once they stop medication*, CNBC (Mar. 29, 2023), available at https://www.cnbc.com/2023/03/29/people-taking-obesity-drugs-ozempic-and-wegovy-gain-weight-once-they-stop-medication.html.

[88] Wilding et al., *Weight regain and cardiometabolic effects after withdrawal of semaglutide: The STEP 1 trial extension*, 24(8) DIABETES OBES METAB. 1553-64 (2022), doi:10.1111/dom.14725, available at https://dom-pubs.onlinelibrary.wiley.com/doi/10.1111/dom.14725.

[89] A. Constantino, *People taking obesity drugs Ozempic and Wegovy gain weight once they stop medication*, CNBC (Mar. 29, 2023), available at https://www.cnbc.com/2023/03/29/people-taking-obesity-drugs-ozempic-and-wegovy-gain-weight-once-they-stop-medication.html.

[90] K. Kindelan, *New study focuses on what happens if you stay on weight loss drug Wegovy for years*, ABC NEWS (May 20, 2024), available at https://abcnews.go.com/GMA/Wellness/new-study-focuses-stay-weight-loss-drug-wegovy/story?id=110401021 (emphasis added).

141.    Wegovy and Ozempic are often marketed as part of a "metabolic reset"[91] even though studies show that weight will be regained upon cessation and even though it has been widely recognized that GLP-1 RAs do not rewire "your neural networks to really define a new body weight setpoint."[92] Not only is it not a "reset," but some patients will actually regain even more weight after stopping the drug.[93]

142.    This was consistent with Lilly's sponsored SURMOUNT-4 study of tirzepatide, which showed that patients regained 14% of their body weight after switching from tirzepatide to a placebo.[94] On average, patients were able to maintain only about 10% of the weight they lost from the time they started taking tirzepatide.[95] Notably, the trend towards weigh regain was on clear upward trajectory at the study endpoint, suggesting patients who had ceased taking the drug would continue to regain weight over time.

143.    A meta-analysis of GLP-1 RA clinical trials found that "several GLP-1 RAs showed a gradual decline in effects on body weight throughout the long term intervention. In comparison to placebo, semaglutide resulted in a reduction of body weight from a mean difference of $-3.28$ kg (95% confidence interval $-4.20$ to $-2.37$) with medium term intervention to $-2.75$ kg ($-4.60$ to $-0.89$) with long term intervention. Liraglutide and dulaglutide also showed a similar trend."[96]

---

[91] Calibrate, *How long does it take to lose weight on Ozempic?* (Jun. 5, 2022), available at https://www.joincalibrate.com/resources/how-long-does-it-take-to-lose-weight-on-ozempic.

[92] A. Constantino, *People taking obesity drugs Ozempic and Wegovy gain weight once they stop medication*, CNBC (Mar. 29, 2023), available at https://www.cnbc.com/2023/03/29/people-taking-obesity-drugs-ozempic-and-wegovy-gain-weight-once-they-stop-medication.html.

[93] *Id.*

[94] Arone et al., *Continued Treatment With Tirzepatide for Maintenance of Weight Reduction in Adults With Obesity: the SURMOUNT-4 Randomized Clinical Trial*, 331 JAMA 38 (2023).

[95] *Id.* at 45.

[96] Yao et al., *Comparative effectiveness of GLP-1 receptor agonists on glycaemic control, body weight, and lipid profile for type 2 diabetes: systematic review and network meta-analysis*, BMJ Open 8 (2023).

### d. Not a Healthy Weight Loss

144.    Taking GLP-1s may actually result in patients being less healthy. Defendants fully understand that overall health is more than a number, whether that number is purely weight or BMI. Despite this, the focus of prescribing GLP-1 RAs for obesity is on a person's BMI and to the extent that BMI is less than 30, whether they also have a weight-related health condition (*i.e.*, cardiovascular disease, etc.).

145.    As previously noted, BMI is a simple calculation that includes only weight and height. This poses limitations for its usefulness on an individual basis, rather than a population basis. For example, Jalen Hurts, Quarterback of the Philadelphia Eagles, is 6 feet and 1 inch tall and weighs 223 pounds, putting his BMI at 29.4 and making him extremely overweight and borderline obese if considering BMI alone. However, this does not account for the fact that he is an elite athlete with a body fat percentage under 10 percent. Nonetheless, if he suffers additional health condition or gains 5 pounds (or simply says he weighs 5 pounds more during a telehealth visit), he would qualify for one of the Defendants' weight loss drugs.

146.    Because of these obvious limitations of BMI, the AMA has urged doctors to deemphasize their use of BMI in determining healthy weights for patients.[97] On June 14, 2023, the AMA adopted a new policy clarifying how BMI should be used as a measure in medicine.[98] The AMA suggests that BMI be used in conjunction with other valid measures of risk such as, but not limited to, measurements of visceral fat, body adiposity index, body composition, relative fat mass, waist circumference and genetic/metabolic factors.[99]

---

[97] *Id.*
[98] AMA, *AMA adopts new policy clarifying role of BMI as a measure in medicine* (Jun. 14, 2023), available at https://www.ama-assn.org/press-center/press-releases/ama-adopts-new-policy-clarifying-role-bmi-measure-medicine.
[99] *Id.*

147.    Weight loss as the sole indicator of health has also been rejected by many clinicians in favor of improvements in other health outcomes and the assess the whole health of an individual.[100] These clinicians have cautioned that "a lower body weight does not always mean a person is healthier."[101] In many instances, when someone loses weight, they lose fat (a good result), but also lose muscle mass (bad).

148.    It is recognized in the medical community that weight loss achieved by Ozempic and Wegovy is often a result of a significant loss of muscle mass.[102] As a result, individuals may be lighter than they were initially but have a higher percentage of body fat.[103]

149.    To further exacerbate the problem, if patients stop taking a GLP-1 RA and regain weight, as discussed above, that weight gain is typically not adding muscle but instead adding fat. Therefore, the resulting "new you" is less healthy—weighing the same but having a higher percentage of body fat.

150.    The loss of too much muscle mass can lead to sarcopenia, a condition called being "skinny fat," in which the patient has decreased muscle mass, lessened bone density, and lower resting metabolic rate—all of which results in a loss of strength and functionality.[104]

---

[100] Hagan & Nelson, *Are Current Guidelines Perpetuating Weight Stigma? A Weight-Skeptical Approach to the Care of Patients with Obesity*, 38(3) J. GEN. INTERN. MED. 793–8 (Sept. 2022), available at https://link.springer.com/content/pdf/10.1007/s11606-022-07821-w.pdf?pdf=button; *Why body mass index doesn't give the whole health picture*, UW Medicine Newsroom (Jun. 20, 2023), available at https://newsroom.uw.edu/video-library/why-body-mass-index-doesnt-give-the-whole-health-picture.
[101] C. Cassata, *Ozempic Can Cause Major Loss of Muscle Mass and Reduce Bone Density*, HEALTHLINE (May 2, 2023), available at https://www.healthline.com/health-news/ozempic-muscle-mass-loss.
[102] K. Sullivan, *Weight loss drugs can lead to muscle loss, too. Is that a bad thing?*, NBC News (May 20, 2023), available at https://www.nbcnews.com/health/health-news/weight-loss-drugs-muscle-loss-rcna84936.
[103] J. Margo, *The alarming twist when using Ozempic for weight loss*, THE AUSTRALIAN FINANCIAL REVIEW (Jul. 21, 2023), available at https://www.afr.com/policy/health-and-education/lighter-but-fatter-the-ozempic-paradox-20230718-p5dp5w.
[104] C. Cassata, *Ozempic Can Cause Major Loss of Muscle Mass and Reduce Bone Density*, HEALTHLINE (May 2, 2023), available at https://www.healthline.com/health-news/ozempic-muscle-mass-loss.

151.    Lilly recognizes that much of the weight loss is actually healthy muscle tissue, but rather than warn consumers that most of the weight loss on tirzepatide will be muscle loss, Lilly has instead invested in developing combination drugs to combat the muscle loss.[105]

152.    Defendants did not warn about the dangers of the type of unhealthy weight loss occurring with GLP-1 RAs. Novo personnel refer to weight loss resulting from Wegovy as a "healthy" weight loss.[106] At the same time, Novo told investors: "Healthy weight loss is, I don't want to call it the next frontier. But it is certainly important … There is a risk if you do introduce very fast and dramatic weight loss you will lose almost 50-50 lean body mass and fat mass. So the tempered but consistent body weight loss could potentially be healthier than a very dramatic fast weight loss."[107] Novo also stated that reasonable preservation of lean body mass "has to be a focus area, and you will probably see [it] in our pipeline."[108]

153.    Similarly for Lilly, it was a "big investor question around [the] muscle issue"[109] and Lilly knew that "the quality of weight loss" mattered.[110] Lilly recognized that there could be some patients who "could benefit from both weight loss and maybe more muscle," hence why Lilly was investing in further research on products that would prevent muscle loss.[111]

154.    Because Defendants do not warn of or disclose the type of weight loss occurring with GLP-1 RAs, patients do not factor that into their analysis of risks and benefits when

---

[105] Dani Blum, *The Race Is On to Stop Ozempic Muscle Loss*, NEW YORK TIMES (Feb. 8, 2024), available at https://www.nytimes.com/2024/02/08/well/live/ozempic-muscle-loss-exercise.html.
[106] A. Pawlowski, *Is it safe to take the anti-obesity drug Wegovy long-term? Doctors weigh in*, TODAY (Jan. 25, 2023), available at https://www.today.com/health/diet-fitness/is-wegovy-safe-for-weight-loss-rcna67277.
[107] *See* 2022-11-03 Q3 Earnings Call.
[108] *Id.*
[109] 20231128 Evercore ISI 6th Annual HealthCONx Conference.
[110] 2024430 Q1 2024 Earnings Call.
[111] 20231128 Evercore ISI 6th Annual HealthCONx Conference.

considering taking a GLP-1 RA and are not aware that they should take specific steps to mitigate this muscle loss, like dietary changes and strength training.[112]

### e. Many Patients Do Not Stay on the Drugs Long Enough to See Benefits

155.    Approximately 58% of patients stop taking a GLP-1 RA within 12 weeks, and 30 percent stop in the first 4 weeks. In May of 2024, Blue Cross Blue Shield published "Real-World Trends in GLP-1 Treatment Persistence and Prescribing for Weight Management" noting these statistics.[113] This means that "[the] value [GLP-1 RA treatment] is not likely to be realized" in most patients.[114]

156.    This is perhaps caused by the fact that side effects are most likely to present themselves in the first 12 weeks of use as the dosage increases. Lilly itself has noted that the risks of the medicine are often seen within just 12 weeks of use as patients are escalating the dosage up.[115] Physicians also recognize that adverse events are also more likely to occur during dose escalation with Ozempic and Wegovy.[116]

157.    Neither Novo or Lilly warns or highlights that most people are unable to tolerate the drug and stay on it long enough for it to make a meaningful difference. These are clear indications that could impact a patient's decision to take a GLP-1 RA.

---

[112] J. Margo, *The alarming twist when using Ozempic for weight loss*, THE AUSTRALIAN FINANCIAL REVIEW (Jul. 21, 2023), available at https://www.afr.com/policy/health-and-education/lighter-but-fatter-the-ozempic-paradox-20230718-p5dp5w.
[113] Blue Health Intelligence, *Real-World Trends in GLP-1 Treatment Persistence and Prescribing for Weight Management*, Issue Brief (May 2024), available at
https://www.bcbs.com/media/pdf/BHI_Issue_Brief_GLP1_Trends.pdf.
[114] Gleason et al., *Real-world persistence and adherence to glucagon-like peptide-1 receptor agonists among obese commercially insured adults without diabetes*, 30 JMCP 2 (2024).
[115] D. Ovalle et al., *Patients grapple with side effects of popular weight-loss drugs*, THE WASHINGTON POST (Aug. 8, 2023), available at https://www.washingtonpost.com/health/2023/08/08/weight-loss-drugs-side-effects-wegovy-ozempic/.
[116] Braxton Medical Clinic, *Understanding the Side Effects of Semaglutide and Tirzepatide* (Jun. 2, 2024), available at https://www.braxtonmedicalclinic.com/post/understanding-the-side-effects-of-semaglutide-and-tirzepatide-a-comprehensive-guide-for-patients-of.

158.    Federal regulators have raised misleading promotional, marketing and advertising materials with Novo and Lilly (the OPDP's March 14, 2008 letter was previously discussed):

159.    On September 23, 2021, Health and Human Services ("HHS") issued a response letter to Novo regarding Wegovy's misleading statements and that fact that it was minimizing the risk of nausea.[117]

160.    In a June 1, 2015 letter to Lilly related to a proposed print advertisement, the OPDP remarked that Lilly "downplays the risk of nausea experienced in clinical trials."

161.    In the same 2015 letter, the OPDP said that the promotional materials "misleadingly" implied that Trulicity was indicated for weight-loss and that patients would see substantial loss in weight. While these promotional materials did contain some language in small print that Trulicity was "not indicated for weight loss," the OPDP found that the inclusion of such disclosures did not "mitigate the overwhelmingly powerful weight loss claims and presentations conveyed in the proposed detailed aid."

162.    A mere 3 months later, on September 16, 2014, the FDA wrote again, finding many significant issues related to Trulicity marketing. In addition to repeated comments about minimization of risk and overstatement of efficacy, this time the OPDP noted that Lilly's marketing materials were broadening the patient population for Trulicity. Indeed, the OPDP wrote that Lilly's marketing was "misleading because they suggest that Trulicity is useful in a broader range of patients or conditions than has been demonstrated by substantial evidence." In a January 30, 2018 letter to Lilly, the OPDP repeated its concerns about the "Net impression" of the Trulicity marketing, specifically regarding the prominence and readability of the small print text in the ads, and referring to letters from 2015, 2016 and 2017 as to this point.

---

[117] OPDP Letter, Sept. 23, 2021 (Novo_GLP_MDL_WEG_NDA_000531088).

163.    A February 12, 2019 letter from OPDP to Lilly repeated the concern about the small print text at the bottom of the commercials.

164.    In a December 17, 2020 letter to Lilly, the OPDP found that Lilly was creating a "misleading impression" that Trulicity was indicated for "weight loss."

165.    Specifically, the OPDO found that Lilly was omitting information that patients were receiving additional medications during the trials which showed weight loss. The OPDO found that the "omission of this information undermines the ability of the viewer to understand and evaluate the efficacy claims presented in the proposed TV Ad."

## FIRST CAUSE OF ACTION
## (NEGLIGENT FAILURE TO WARN—AGAINST ALL DEFENDANTS)

166.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

167.    At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Ozempic and Mounjaro that were used by Plaintiff.

168.    Ozempic and Mounjaro were expected to and did reach the usual consumers, handlers, and persons coming into contact with said products without substantial change in the condition in which they were produced, manufactured, sold, distributed, and marketed by the Defendants.

169.    At all relevant times, and at the times Ozempic and Mounjaro left the Defendants' control, Defendants knew or should have known that Ozempic and Mounjaro were unreasonably dangerous because they did not adequately warn of the risk of gastroparesis and its sequelae, especially when used in the form and manner as provided by Defendants.

170.    Despite the fact that Defendants knew or should have known that Ozempic and Mounjaro caused unreasonably dangerous injuries, Defendants continued to market, distribute, and/or sell Ozempic and Mounjaro to consumers, including Plaintiff, without adequate warnings.

171.    Despite the fact that Defendants knew or should have known that Ozempic and Mounjaro caused unreasonably dangerous injuries, Defendants continued to market Ozempic and Mounjaro to prescribing physicians, including Plaintiff's prescribing physician(s), without adequate warnings.

172.    Defendants knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of their failure to provide adequate warnings, as set forth herein.

173.    At all relevant times, given their increased safety risks, Ozempic and Mounjaro were not fit for the ordinary purpose for which they were intended.

174.    At all relevant times, given their increased safety risks, Ozempic and Mounjaro did not meet the reasonable expectations of an ordinary consumer, particularly the Plaintiff.

175.    Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or distribution of Ozempic and Mounjaro into the stream of commerce, including a duty to assure that the products would not cause users to suffer unreasonable, dangerous injuries, such as gastroparesis and its sequelae.

176.    At all relevant times, Plaintiff was using Ozempic and Mounjaro for the purposes and in a manner normally intended.

177.    The Ozempic and Mounjaro designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective due to

inadequate warnings or instructions, as the Defendants knew or should have known that the products created a risk of serious and dangerous injuries, including gastroparesis and its sequelae, as well as other severe and debilitating personal injuries the Defendants failed to adequately warn of said risk.

178. The Ozempic and Mounjaro designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects, including gastroparesis, as well as other severe health consequences from Ozempic and Mounjaro, they failed to provide adequate warnings to users and/or prescribers of the products, and continued to improperly advertise, market and/or promote their products, Ozempic and Mounjaro.

179. The labels for Ozempic and Mounjaro were inadequate because they did not warn and/or adequately warn of all possible adverse side effects causally associated with the use of Ozempic and Mounjaro, including the increased risk of gastroparesis and its sequelae.

180. The labels for Ozempic and Mounjaro were inadequate because they did not warn and/or adequately warn that Ozempic and Mounjaro had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae.

181. The labels for Ozempic and Mounjaro were inadequate because they did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Ozempic and Mounjaro.

182. The labels for Ozempic and Mounjaro were inadequate because they did not warn and/or adequately warn of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects.

183.    Communications made by Defendants to Plaintiff and Plaintiff's prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn of all possible adverse side effects causally associated with the use of Ozempic and Mounjaro, including the increased risk of gastroparesis and its sequelae.

184.    Communications made by Defendants to Plaintiff's prescribing physician(s) and Plaintiff were inadequate because Defendants failed to warn and/or adequately warn that Ozempic and Mounjaro had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae.

185.    Plaintiff had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and Plaintiff's reliance upon Defendants' warnings was reasonable.

186.    Plaintiff's prescribing physician(s) had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and the physicians' reliance upon Defendants' warnings was reasonable.

187.    Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risk of gastroparesis and its sequelae, which are causally associated with Ozempic and Mounjaro, they would not have prescribed Ozempic or Mounjaro and/or would have provided Plaintiff with adequate warnings regarding the dangers of Ozempic and Mounjaro so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic and Mounjaro.

188.    Upon information and belief, had Plaintiff's prescribing physician(s) been warned that Ozempic and Mounjaro had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae, they would not have prescribed Ozempic or Mounjaro and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient

and/or adequate testing of Ozempic and Mounjaro so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic and Mounjaro.

189.    If Plaintiff had been warned of the increased risk of gastroparesis and its sequelae causally associated with Ozempic and Mounjaro, Plaintiff would not have used Ozempic or Mounjaro and/or suffered from gastroparesis and its sequelae.

190.    If Plaintiff had been warned that Ozempic and Mounjaro had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae, Plaintiff would not have used Ozempic or Mounjaro and/or suffered gastroparesis and its sequelae.

191.    If Plaintiff had been warned of the increased risk of gastroparesis and its sequelae, which are causally associated with Ozempic and Mounjaro, then Plaintiff would have informed Plaintiff's prescribers that Plaintiff did not want to take Ozempic or Mounjaro.

192.    Upon information and belief, if Plaintiff had informed Plaintiff's prescribing physician(s) that Plaintiff did not want to take Ozempic or Mounjaro due to the risk of gastroparesis and its sequelae, or the lack of adequate testing for safety risks, Plaintiff's prescribing physician(s) would not have prescribed Ozempic or Mounjaro.

193.    By reason of the foregoing, Defendants have become liable to the Plaintiff for the designing, marketing, promoting, distribution and/or selling of unreasonably dangerous products, Ozempic and Mounjaro.

194.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed defective products which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendants are therefore liable for the injuries are therefore liable for the injuries sustained by Plaintiff.

195. Defendants' inadequate warnings for Ozempic and Mounjaro were acts that amount to willful, wanton, grossly negligent, and/or reckless conduct by Defendants.

196. Said inadequate warnings for Defendants' drugs Ozempic and Mounjaro were a substantial factor in causing Plaintiff's injuries.

197. As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous injuries including gastroparesis and its sequelae, which resulted in other severe personal injuries, physical pain, and mental anguish, including diminished enjoyment of life, and fear of developing any of the above-named health consequences.

198. As a result of the foregoing acts and omissions, the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

## SECOND CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY – FAILURE TO WARN –AGAINST ALL DEFENDANTS)

199. Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

200. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Ozempic and Mounjaro that were used by Plaintiff.

201. Ozempic and Mounjaro were expected to and did reach the usual consumers, handlers, and persons coming into contact with said products without substantial change in the

condition in which they were produced, manufactured, sold, distributed, and marketed by Defendants.

202.    At all relevant times, and at the times Ozempic and Mounjaro left Defendants' control, Defendants knew or should have known that Ozempic and Mounjaro were unreasonably dangerous because they did not adequately warn of the risk of gastroparesis and its sequelae, especially when used in the form and manner as provided by Defendants.

203.    Despite the fact that Defendants knew or should have known that Ozempic and Mounjaro caused unreasonably dangerous injuries, Defendants continued to market, distribute, and/or sell Ozempic and Mounjaro to consumers, including Plaintiff, without adequate warnings.

204.    Despite the fact that Defendants knew or should have known that Ozempic and Mounjaro caused unreasonably dangerous injuries, Defendants continued to market Ozempic and Mounjaro to prescribing physicians, including Plaintiff's prescribing physician(s), without adequate warnings.

205.    Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of their failure to provide adequate warnings, as set forth herein.

206.    At all relevant times, given their increased safety risks, Ozempic and Mounjaro were not fit for the ordinary purpose for which they were intended—namely, as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

207.    Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or distribution of Ozempic and Mounjaro into the stream of commerce, including a duty to assure

that the products would not cause users to suffer unreasonable, dangerous injuries, such as gastroparesis, and a duty to adequately warn Plaintiff of potentially dangerous side effects.

208.    At all relevant times, Plaintiff was using Ozempic and Mounjaro for the purposes and in a manner normally intended.

209.    At all relevant times, there existed unequal knowledge between the Defendants and the Plaintiff regarding the risk of Ozempic.

210.    The Ozempic and Mounjaro designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective due to inadequate warnings or instructions, as Defendants knew or should have known that the products created a risk of serious and dangerous injuries, including gastroparesis and its sequelae, as well as other severe and debilitating personal injuries the Defendants failed to adequately warn of said risk.

211.    The Ozempic and Mounjaro designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects, including gastroparesis and its sequelae, as well as other severe health consequences from Ozempic and Mounjaro, they failed to provide adequate warnings to users and/or prescribers of the products, and continued to improperly advertise, market and/or promote their products, Ozempic and Mounjaro.

212.    The labels for Ozempic and Mounjaro were inadequate because they did not warn and/or adequately warn of all possible adverse side effects causally associated with the use of Ozempic and Mounjaro, including the increased risk of gastroparesis and its sequelae.

213.    The labels for Ozempic and Mounjaro were inadequate because they did not warn and/or adequately warn that Ozempic and Mounjaro had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae.

214.    The labels for Ozempic and Mounjaro were inadequate because they did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Ozempic and Mounjaro.

215.    The labels for Ozempic and Mounjaro were inadequate because they did not warn and/or adequately warn of the severity and duration of adverse effects, as the warnings given did not accurately reflect the symptoms or severity of the side effects.

216.    Communications made by Defendants to Plaintiff and Plaintiff's prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn of all possible adverse side effects causally associated with the use of Ozempic and Mounjaro, including the increased risk of gastroparesis and its sequelae.

217.    Communications made by Defendants to Plaintiff and Plaintiff's prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn that Ozempic and Mounjaro had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae.

218.    Plaintiff had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and Plaintiff's reliance upon Defendants' warnings was reasonable.

219.    Plaintiff's prescribing physician(s) had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and his/her/their reliance upon Defendants' warnings was reasonable.

220.    Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risks of gastroparesis and its sequelae, which are causally associated with Ozempic and Mounjaro, then the prescribing physician would not have prescribed Ozempic and Mounjaro and/or would have provided Plaintiff with adequate warnings regarding the dangers of Ozempic and Mounjaro so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic and Mounjaro.

221.    Upon information and belief, had Plaintiff's prescribing physician(s) been warned that Ozempic and Mounjaro had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae, the prescribing physician would not have prescribed Ozempic and Mounjaro and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Ozempic and Mounjaro so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic and Mounjaro.

222.    If Plaintiff had been warned of the increased risks of gastroparesis and its sequelae, which are causally associated with Ozempic and Mounjaro, then Plaintiff would not have used Ozempic and Mounjaro and/or suffered from gastroparesis and its sequelae.

223.    If Plaintiff had been warned that Ozempic and Mounjaro had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae, then Plaintiff would not have used Ozempic and Mounjaro and/or suffered gastroparesis and its sequelae.

224.    If Plaintiff had been warned of the increased risks of gastroparesis and its sequelae, which is causally associated with Ozempic and Mounjaro, then Plaintiff would have informed Plaintiff's prescribing physician(s) that Plaintiff did not want to take Ozempic and Mounjaro.

225.    Upon information and belief, if Plaintiff had informed Plaintiff's prescribing physician(s) that Plaintiff did not want to take Ozempic and Mounjaro due to the risks of

gastroparesis and its sequelae, or the lack of adequate testing for safety risks, then Plaintiff's prescribing physician(s) would not have prescribed Ozempic and Mounjaro.

226.    By reason of the foregoing, Defendants have become liable to Plaintiff for the designing, marketing, promoting, distribution and/or selling of an unreasonably dangerous products, Ozempic and Mounjaro.

227.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed defective products which created an unreasonable risk to the health of consumers and to Plaintiff in particular, and Defendants are therefore liable for the injuries sustained by Plaintiff.

228.    Defendants' inadequate warnings for Ozempic and Mounjaro were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

229.    Said inadequate warnings for Defendants' drugs Ozempic and Mounjaro were a substantial factor in causing Plaintiff's injuries.

230.    As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous injuries, including gastroparesis and its sequelae, which resulted in other severe personal injuries, physical pain, and mental anguish, including diminished enjoyment of life, and fear of developing any of the above-named health consequences.

231.    As a result of the foregoing acts and omissions, Plaintiff did incur medical, health, incidental, and related expenses, and requires and/or will require more health care and services. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

**THIRD CAUSE OF ACTION**
**(NEGLIGENT MISREPRESENTATION – AGAINST ALL DEFENDANTS)**

232.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

233.    At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Ozempic and Mounjaro that were used by Plaintiff.

234.    At all relevant times, Defendants knew or should have known that Ozempic and Mounjaro had not been adequately and/or sufficiently tested for safety.

235.    At all relevant times, Defendants knew or should have known of the serious side effects of Ozempic and Mounjaro, including gastroparesis and its sequelae.

236.    Defendants had a duty to disclose material information about Ozempic and Mounjaro to Plaintiff and Plaintiff's prescribing physician(s) that Ozempic and Mounjaro are causally associated with increased risk of gastroparesis and its sequelae, because Defendants held a special expertise with respect to Ozempic and Mounjaro, Plaintiff, as a user of Ozempic and Mounjaro, had a special relationship of trust with Defendants, and Defendants knew that their statements regarding the risks causally associated with Ozempic and Mounjaro would be relied on by Ozempic and Mounjaro users.

237.    At all relevant times, Defendants knew or should have known of the serious side effects of Ozempic and Mounjaro, including gastroparesis and its sequelae.

238.    Nonetheless, Defendants made material misrepresentations and omissions and/or concealments to Plaintiff, Plaintiff's prescribing physician(s), the medical and healthcare

community at large, and the general public regarding the safety and/or efficacy of Ozempic and Mounjaro.

239. Defendants represented affirmatively and by omission in advertisements and on the labels of Ozempic and Mounjaro that Ozempic and Mounjaro were safe and effective drugs for treatment of adults with Type 2 diabetes, despite being aware of the increased risks of gastroparesis and its sequelae causally associated with using Ozempic and Mounjaro.

240. Defendants were aware or should have been aware that their representations were false or misleading and/or knew that Defendants were concealing and/or omitting material information from Plaintiff, Plaintiff's prescribing physician(s), the medical and healthcare community, and the general public.

241. Defendants knew that Plaintiff and Plaintiff's prescribing physicians(s) had no way to determine the truth behind Defendants' misrepresentations and concealments surrounding Ozempic and Mounjaro, as set forth herein.

242. Upon information and belief, Plaintiff's prescribing physician(s) justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to prescribe Ozempic and Mounjaro to Plaintiff.

243. Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risk of gastroparesis and its sequelae causally associated with Ozempic and Mounjaro, they would not have prescribed Ozempic and Mounjaro and/or would have provided Plaintiff with adequate information regarding safety of Ozempic and Mounjaro so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic and Mounjaro.

244. Upon information and belief, had Plaintiff's prescribing physician(s) been told that Ozempic and Mounjaro had not been sufficiently and/or adequately tested for safety risks,

including gastroparesis and its sequelae, they would not have prescribed Ozempic and Mounjaro and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Ozempic and Mounjaro so that Plaintiff can make an informed decision regarding Plaintiff's use of Ozempic and Mounjaro.

245.    Plaintiff reasonably relied on the false and/or misleading facts and information disseminated by Defendants, which included Defendants' omissions of material facts, which Plaintiff had no way to know were omitted.

246.    Had Plaintiff been told of the increased risk of gastroparesis and its sequelae causally associated with Ozempic and Mounjaro, Plaintiff would not have used Ozempic and Mounjaro and/or suffered gastroparesis and its sequelae.

247.    Defendants' misrepresentations and omissions of material facts amount to willful, wanton, and/or reckless conduct.

248.    As a direct and proximate result of the above stated false representations and/or omissions as described herein, Plaintiff was caused to suffer serious and dangerous injuries including gastroparesis and its sequelae, which resulted in other severe and debilitating personal injuries, physical pain, and mental anguish, including diminished enjoyment of life, and fear of developing any of the above-named health consequences.

249.    As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

## FOURTH CAUSE OF ACTION
## (BREACH OF EXPRESS WARRANTY – AGAINST ALL DEFENDANTS)

250.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

251.    At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed and/or have acquired the Defendants who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Ozempic and Mounjaro that were used by Plaintiff.

252.    At all relevant times, Defendants expressly warranted to Plaintiff and Plaintiff's prescribing physician(s) that Ozempic and Mounjaro were safe as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

253.    The aforementioned express warranties were made to Plaintiff's prescribing physician(s) and to Plaintiff by way of Ozempic's and Mounjaro's labels, websites, advertisements, promotional materials, and through other statements.

254.    As a result of Defendants' express warranties to Plaintiff's prescribing physician(s) and to Plaintiff, Plaintiff's prescribing physicians were induced to, and did, prescribe Ozempic and Mounjaro to Plaintiff, and Plaintiff was induced to, and did, use Ozempic and Mounjaro.

255.    At all relevant times, Defendants reasonably anticipated and expected that individuals, such as the Plaintiff, would use and/or consume Ozempic and Mounjaro based upon their express warranties.

256.    At all relevant times, Defendants reasonably anticipated and expected that prescribing physicians, such as the Plaintiff's prescribing physician(s), would recommend, prescribe and/or dispense Ozempic and Mounjaro based upon their express warranties.

257.    At all relevant times, Defendants knew or should have known that Ozempic and Mounjaro were unreasonably dangerous because of the increased risk of gastroparesis, especially when the drugs were used in the form and manner as provided by Defendants.

258.    At all relevant times, Defendants knew or should have known that Ozempic and Mounjaro had not been sufficiently and/or adequately tested for safety.

259.    The unreasonably dangerous characteristics of Ozempic and Mounjaro were beyond that which would be contemplated by the ordinary user, such as Plaintiff, with the ordinary knowledge common to the public as to the drugs' characteristics.

260.    The unreasonably dangerous characteristics of Ozempic and Mounjaro were beyond that which would be contemplated by Plaintiff's prescribing physician(s), with the ordinary knowledge common to prescribing physician as to the drugs' characteristics.

261.    At the time Ozempic and Mounjaro left the Defendants' control, Ozempic and Mounjaro did not conform to Defendants' express warranties because Ozempic and Mounjaro were not safe to use as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus, to reduce cardiovascular risk in patients with type 2 diabetes, or to control weight, in that they were causally associated with an increased risk of gastroparesis and its sequelae.

262.    The express warranties made by Defendants regarding the safety of Ozempic and Mounjaro were made with the intent to induce Plaintiff to use the products and/or Plaintiff's prescribing physician(s) to prescribe the products.

263.    Defendants knew and/or should have known that by making the express warranties to Plaintiff and/or Plaintiff's prescribing physician(s) it would be the natural tendency of Plaintiff

to use Ozempic and Mounjaro and/or the natural tendency of Plaintiff's prescribing physician(s) to prescribe Ozempic and Mounjaro.

264.    Plaintiff and Plaintiff's prescribing physician(s), as well as members of the medical community, relied on the express warranties of the Defendants identified herein.

265.    Had Defendants not made these express warranties, Plaintiff would not have used Ozempic or Mounjaro and/or, upon information and belief, Plaintiff's prescribing physician(s) would not have prescribed Ozempic or Mounjaro.

266.    Plaintiff's injuries and damages were directly and/or proximately caused by Defendants' breach of the aforementioned express warranties.

267.    Plaintiff's injuries and damages arose from a reasonably anticipated use of the products by Plaintiff.

268.    Accordingly, Defendants are liable as a result of their breach of express warranties to Plaintiff.

269.    As a result of the foregoing breaches, Plaintiff was caused to suffer serious and dangerous injuries including gastroparesis and its sequelae, which resulted in other severe personal injuries, physical pain, and mental anguish, including diminished enjoyment of life, and fear of developing any of the above-named health consequences.

270.    By reason of the foregoing, Plaintiff has been severely injured and will require more constant and continuous medical monitoring and treatment than prior to Plaintiff's use of Defendants' Ozempic and Mounjaro drugs.

271.    As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related

expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

## FIFTH CAUSE OF ACTION
## (BREACH OF IMPLIED WARRANTY–AGAINST ALL DEFENDANTS)

272. Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

273. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Ozempic and Mounjaro that were used by Plaintiff.

274. Ozempic and Mounjaro were expected to and did reach the usual consumers, handlers, and persons encountering said products without substantial change in the condition in which they were produced, manufactured, sold, distributed, and marketed by the Defendants.

275. At all relevant times, Defendants impliedly warranted to Plaintiff, Plaintiff's prescribing physician(s), and the medical community that Ozempic and Mounjaro were of merchantable quality and safe and fit for their ordinary purpose.

276. At all relevant times, Defendants knew or should have known that Ozempic and Mounjaro were unreasonably dangerous because of their increased risk of gastroparesis and its sequelae, especially when the drugs were used in the form and manner as provided by Defendants.

277. At all relevant times, Defendants knew or should have known that Ozempic and Mounjaro had not been sufficiently and/or adequately tested for safety.

278. At the time Ozempic and Mounjaro left Defendants' control, Ozempic and Mounjaro did not conform to Defendants' implied warranty and was unfit for their ordinary

purpose because Defendants failed to provide adequate warnings of the drugs' causal association with increased risk of gastroparesis and its sequelae.

279.    At all relevant times, Defendants reasonably anticipated and expected that prescribing physician(s), such as Plaintiff's prescribing physician(s), would recommend, prescribe and/or dispense Ozempic and Mounjaro for use by their patients to improve glycemic control in adults with type 2 diabetes, reduce cardiovascular risk, and/or to promote weight loss.

280.    At all relevant times, Defendants reasonably anticipated and expected that individuals, such as Plaintiff, would use and/or consume Ozempic and Mounjaro for their ordinary purpose.

281.    Despite the fact that Defendants knew or should have known that Ozempic, Rybelsus and Mounjaro causes unreasonably dangerous injuries, such as gastroparesis and its sequelae, Defendants continued to market, distribute, and/or sell Ozempic and Mounjaro to consumers, including Plaintiff, without adequate warnings.

282.    The unreasonably dangerous characteristics of Ozempic and Mounjaro were beyond that which would be contemplated by the ordinary user, such as Plaintiff, with the ordinary knowledge common to the public as to the drugs' characteristics.

283.    The unreasonably dangerous characteristics of Ozempic and Mounjaro were beyond that which would be contemplated by Plaintiff's prescribing physician(s), with the ordinary knowledge common to prescribing physician as to the drugs' characteristics.

284.    Plaintiff reasonably relied on Defendants' implied warranty of merchantability relating to Ozempic and Mounjaro's safety and efficacy.

285.    Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether Ozempic and Mounjaro were of merchantable quality and safe and fit for their intended use.

286.    Upon information and belief Plaintiff's prescribing physician(s) relied on Defendants' implied warranty of merchantability and fitness for the ordinary use and purpose relating to Ozempic and Mounjaro.

287.    Upon information and belief Plaintiff's prescribing physician(s), reasonably relied upon the skill and judgment of Defendants as to whether Ozempic and Mounjaro were of merchantable quality and safe and fit for their intended use.

288.    Had Defendants not made these implied warranties, Plaintiff would not have used Ozempic and Mounjaro and/or, upon information and belief, Plaintiff's prescribing physician(s) would not have prescribed Ozempic and Mounjaro, and/or would have altered their prescribing practices and/or would have provided Plaintiff with adequate warnings regarding the dangers of Ozempic and Mounjaro to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic and Mounjaro.

289.    Defendants herein breached the aforesaid implied warranty of merchantability because the drugs Ozempic and Mounjaro were not fit for their intended purpose.

290.    Defendants' breaches of implied warranty of merchantability were a substantial factor in causing Plaintiff's injuries.

291.    As a result of the foregoing breaches, Plaintiff was caused to suffer serious and dangerous injuries including gastroparesis and its sequelae, which resulted in other severe and debilitating personal injuries, physical pain, and mental anguish, including diminished enjoyment of life, and fear of developing any of the above-named health consequences.

292.    As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses.

Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

## SIXTH CAUSE OF ACTION
## (FRAUDULENT CONCEALMENT – AGAINST ALL DEFENDANTS)

293.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

294.    At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Ozempic and Mounjaro that were used by Plaintiff.

295.    At all relevant times, Defendants knew or should have known that Ozempic and Mounjaro had not been adequately and/or sufficiently tested for safety.

296.    At all relevant times, Defendants knew or should have known that Ozempic and Mounjaro were unreasonably dangerous because of the increased risk of gastroparesis and its sequelae, especially when the drugs were used in the form and manner as provided by Defendants.

297.    Defendants had a duty to disclose material information about Ozempic and Mounjaro to Plaintiff and Plaintiff's prescribing physician(s), namely that Ozempic and Mounjaro are causally associated with increased risk of gastroparesis and its sequelae, because Defendants have superior knowledge of the drugs and their dangerous side effects, this material information is not readily available to Plaintiff or Plaintiff's prescribing physician(s) by reasonable inquiry, and Defendants knew or should have known that Plaintiff and Plaintiff's prescribing physician(s) would act on the basis of mistaken knowledge.

298.    Nonetheless, Defendants consciously and deliberately withheld and concealed from Plaintiff's prescribing physician(s), Plaintiff, the medical and healthcare community, and the general public this material information.

299.    Although the Ozempic and Mounjaro labels lists nausea, vomiting, diarrhea, abdominal pain, and constipation as common adverse reactions reported in Ozempic and Mounjaro patients, they do not mention gastroparesis as a risk of taking Ozempic and Mounjaro, nor do they disclose gastroparesis as a chronic condition that can result as a consequence of taking Ozempic and Mounjaro.

300.    Defendants' promotional websites for Ozempic and Mounjaro similarly do not disclose that Ozempic and Mounjaro are causally associated with increased risk of gastroparesis.

301.    Defendants' omissions and concealment of material facts were made purposefully, willfully, wantonly, and/or recklessly in order to mislead and induce medical and healthcare providers, such as Plaintiff's prescribing physician(s), and adult Type 2 diabetes patients, such as Plaintiff, to dispense, provide, prescribe, accept, purchase, and/or consume Ozempic and Mounjaro for treatment of Type 2 Diabetes.

302.    Defendants knew or should have known that Plaintiff's prescribing physician(s) would prescribe, and Plaintiff would use Ozempic and Mounjaro without the awareness of the risks of serious side effects, including gastroparesis and its sequelae.

303.    Defendants knew that Plaintiff and Plaintiff's prescribing physicians(s) had no way to determine the truth behind Defendants' misrepresentations and concealments surrounding Ozempic and Mounjaro, as set forth herein.

304.    Upon information and belief, Plaintiffs prescribing physician(s) justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to dispense, provide, and prescribe Ozempic and Mounjaro.

305.    Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risk of gastroparesis causally associated with Ozempic and Mounjaro, they would not have prescribed Ozempic and Mounjaro and/or would have provided Plaintiff with adequate information regarding the increased risk of gastroparesis causally associated with Ozempic and Mounjaro to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic and Mounjaro.

306.    Upon information and belief, had Plaintiff's prescribing physician(s) been told that Ozempic and Mounjaro had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae, they would not have prescribed Ozempic and Mounjaro and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Ozempic and Mounjaro to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic and Mounjaro.

307.    Plaintiff justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to purchase and/or consume Ozempic and Mounjaro.

308.    Had Plaintiff been informed of the increased risks causally associated with Ozempic and Mounjaro, Plaintiff would not have used Ozempic and Mounjaro and/or suffered gastroparesis and its sequelae.

309.    Defendants' fraudulent concealments were a substantial factor in causing Plaintiff's injuries.

310.    As a direct and proximate result of the above stated omissions as described herein, Plaintiff was caused to suffer serious and dangerous injuries including gastroparesis and its sequelae, which resulted in other severe personal injuries, physical pain, and mental anguish, including diminished enjoyment of life, and fear of developing any of the above-named health consequences.

311.    As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

## SEVENTH CAUSE OF ACTION: VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILL. COMP. STAT. ANN. 505/1 et seq.

312.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

313.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") contains, in relevant part, the following definitions:

314.    (b) The term "merchandise" includes any objects, wares, goods, commodities, intangibles, real estate situated outside the State of Illinois, or services.

315.    (c) The term "person" includes any natural person or his legal representative, partnership, corporation (domestic and foreign), company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof.

316.    (e) The term "consumer" means any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household.

317.    (f) The terms "trade" and "commerce" mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State.

318.    815 Ill. Comp. Stat. Ann. 505/1.

319.    The unsafe and defective Ozempic is "merchandise."  815 Ill. Comp. Stat. Ann. 505/1(b).

320.    Defendant's act of selling the unsafe and defective Ozempic and Mounjaro to Plaintiff is "trade or commerce." 815 Ill. Comp. Stat. Ann. 505/1(f).

321.    Plaintiff is a "person" and a "consumer." 815 Ill. Comp. Stat. Ann. 505/1(c),(e).

322.    Defendants undertook a deceptive act or practice when it concealed information that its products could cause gastroparesis and its sequelae.

323.    Defendants were aware that a multitude of medical literature and clinical trials causally linked gastroparesis and its sequelae to Ozempic and Mounjaro.

324.    During this time period, Defendants knew and that consumers, such as Plaintiff, would rely on their material omission that Ozempic and Mounjaro carried a risk of gastroparesis and its sequelae were safe for their intended purpose. Defendants intended that the Plaintiff rely on this fraudulent representation of safety, and material omission of fact to sell its defective products.

325.    Defendants' deceptive practice of fraudulently concealing and omitting material information about the safety of Ozempic and Mounjaro occurred in the course of trade or commerce.

326.    Plaintiff was actually damaged by the Defendants' deceptive practice as documented above, where the complaint states that Plaintiff was diagnosed with gastroparesis as a result of consuming Ozempic and Mounjaro.

327.    Defendants' fraudulent concealment and material omission of information about the danger of its products caused Plaintiff's injuries because it was reasonably foreseeable that Plaintiff would have used Ozempic and Mounjaro for their intended purpose and without Defendants' deceptive conduct, Plaintiff would not have purchased and used the products.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants on each of the above referenced claims and Causes of Action and as follows:

1.    Awarding compensatory damages to Plaintiff for past and future damages, including but not limited to pain and suffering for severe personal injuries sustained by Plaintiff, health care costs, medical monitoring, together with interest and costs as provided by law;

2.    Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of Defendants, who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

3.    Awarding Plaintiff the costs of these proceedings; and

4.    Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Dated: July 25, 2025                    RESPECTFULLY SUBMITTED,

_/s/ Jonathan M. Sedgh_
Jonathan M. Sedgh
Morgan & Morgan
199 Water Street, Suite 1500
New York, NY 10038
Phone: (212) 738-6839
_jsedgh@forthepeople.com_

Nicole Lovett
Morgan & Morgan
201 N Franklin St, 7th Floor
Tampa, FL 33602
Phone: (813) 275-5263
Fax: (813) 222-2455
_nlovett@forthepeople.com_

_Attorneys for Plaintiff_